```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     ORLANDO DIVISION

 3               Docket No. 6:13-cv-1426

 4

 5   . . . . . . . . . . . . . . . ..
     JOAN JARA, in her individual    :
 6   capacity and in her capacity    :
     as the personal representative :
 7   of the Estate of Victor Jara,   :
     et al.                          :
 8                                   :    Orlando, Florida
                 Plaintiffs          :    June 14, 2016
 9                                   :    8:58 a.m.
                    v.               :
10                                   :
     PEDRO PABLO BARRIENTOS NUNEZ    :
11                                   :
                 Defendant           :
12   . . . . . . . . . . . . . . . .:

13

14

15            TRANSCRIPT OF JURY TRIAL, VOLUME II
16         BEFORE THE HONORABLE ROY B. DALTON, JR.
                 UNITED STATES DISTRICT JUDGE
17

18

19

20

21

22   Court Reporter:    Amie R. First, RDR, CRR, CRC, CPE
                        AmieFirst.CourtReporter@gmail.com
23

24   Proceedings recorded by mechanical stenography.

25   Transcript produced by Computer-Aided Transcription.
```

```
1    APPEARANCES:

2

3    For the Plaintiffs:   Mark D. Beckett

4                          Richard S. Dellinger

5                          L. Kathleen Roberts

6                          Daniel McLaughlin

7                          Christian Urrutia

8                          Amy Belsher

9
     For the Defendant:   Sean W. Landers
10

11                         Luis F.Calderon

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                         * * * * *

 3          THE COURT:  All right.  Good morning.  We're back

 4   on the record in Jara versus Barrientos Nunez, Case Number

 5   6:13-civil-1426.

 6          The Court notes counsel and the parties are

 7   present.

 8          My clerk is passing out to you a letter that was

 9   delivered to me this morning from Juror Number 7,

10   Mr. Ferris.  I don't know if Mr. Ferris had a conscience

11   moment or if he just didn't enjoy the drive to and from

12   Daytona Beach.  But he has elected to disclose that he's

13   biased in favor of the defendant.

14          And I'll let you all take a minute to take a look

15   at his letter.  And once you've had a chance to read it,

16   we'll talk about it.

17          MR. DELLINGER:  Your Honor, I think the --

18          THE COURT:  Let's give everybody a chance to read

19   the letter, Mr. Dellinger.  And we'll talk about it.

20          Mr. Landers, Mr. Calderon, have you all had a

21   chance to read the letter?

22          MR. CALDERON:  Yes, Your Honor.

23          THE COURT:  Do you want to be heard,

24   Mr. Dellinger?

25          MR. DELLINGER:  I think the letter makes it clear
```

```
 1    that the juror has indicated that there's no way that he
 2    can be fair.  In fact, he states that.
 3              I knew there was no possible way I could --
 4              THE COURT:  I've read -- I've read the letter,
 5    Mr. Dellinger.  I don't think I need any argument on it.
 6    I'm just bringing it to your attention.
 7              MR. DELLINGER:  Thank you, Your Honor.
 8              THE COURT:  I'm going to excuse Mr. Ferris.  But I
 9    am going to advise Mr. Ferris that we're going to look into
10    whether or not there are going to be consequences.  This is
11    not an inconvenience, as he phrases it.  It's not anywhere
12    close to an inconvenience.
13              MR. DELLINGER:  Did you ask the juror if he had
14    spoken to any of the other jurors, the panel?
15              THE COURT:  I'm going to do an inquiry.
16              Thank you.
17              Yes.  I haven't spoken to anybody yet, but I'm
18    going to do an inquiry.
19              MR. DELLINGER:  Thank you, Your Honor.
20              THE COURT:  You're welcome.
21              Would you ask Mr. Carter to bring Mr. Ferris in?
22              They're not there yet.  That's fine.  We can wait
23    for them.
24              MR. DELLINGER:  We have another matter we can take
25    a moment for, Your Honor.
```

1          THE COURT:  What's that?

2          MR. DELLINGER:  I just wanted to mention to the

3  Court that during the course of the evidence, we have some

4  stipulated facts.  The parties have stipulated to facts.

5  We're going to be reading it in.  There are approximately

6  41 different items that we'll be reading in.

7          And there's instruction for the Court.

8          We're going to break it up into three different

9  sections based on the evidence that comes in.

10         THE COURT:  Okay.  Just let me know when you want

11  to do that, and I'll give the jury an appropriate

12  instruction with respect to what a stipulated fact is and

13  how they should regard it.

14         MR. DELLINGER:  Thank you, Your Honor.

15         THE COURT:  You're welcome.

16         MR. DELLINGER:  So we are efficient with the

17  Court's time and while the jury is not out here, when the

18  next witness goes on, there is one disputed exhibit that

19  has not been stipulated in.

20         I want to make the Court aware of it.  I know that

21  you are inclined to wait until the exhibit is about to come

22  in.  But there is one picture that's going to be disputed.

23         THE COURT:  Which one is it?  Plaintiff's exhibit

24  what?

25         MS. ROBERTS:  Number 1.

```
 1              THE COURT:  Number 1?

 2              What's the purpose of Plaintiff's 1?  What will it

 3    be offered for?

 4              MR. DELLINGER:  This witness will be

 5    Miss Roberts', so I'll let her make the argument,

 6    Your Honor.

 7              MS. ROBERTS:  Good morning.

 8              THE COURT:  How are you, Miss Roberts?

 9              MS. ROBERTS:  I've doing very well.  Thank you.

10              Miss Bunster will be testifying about this photo

11    in relation to her father's work in this particular shanty

12    town in Santiago and the album that he created at the

13    request of the inhabitants.  It illustrates the kind of

14    work he was doing at that time.

15              THE COURT:  And whose witness will this be for the

16    defense, Mr. Calderon?

17              MR. CALDERON:  I'm sorry, Your Honor.  I was

18    trying to find the exhibit.  We didn't get a binder.

19              MS. ROBERTS:  I can show you.

20              MR. CALDERON:  Yes, Judge.  Our position with

21    regard to this exhibit --

22              THE COURT:  I can't hear you, Mr. Calderon.

23              MR. CALDERON:  I apologize.

24              Our position with regard to this exhibit is that

25    this is irrelevant.  It's merely to inflame the passions of
```

1    the jury to create -- to show Mr. Jara with young children.

2    It's not really relevant to any of the proceedings or what

3    we're arguing here today.

4           THE COURT:  All right.  I'm going to interpret

5    that as a 403 objection, that the prejudicial effect

6    outweighs the probative value.

7           I'm going to overrule the objection.

8           It's a wrongful death case.  I think the jury is

9    entitled to have a full complement of Mr. Jara's life.  I

10   don't think there is anything about the picture that is so

11   prejudicial that it prohibits admission.

12          You can certainly make arguments with respect to

13   the weight and whether you think it has any bearing on the

14   ultimate issue, but I don't think there is any evidentiary

15   reason to exclude it.

16          Anything else?

17          MS. ROBERTS:  I don't think so, Your Honor.  Thank

18   you.

19          THE COURT:  Thanks.

20          I don't think -- in fact, I know I didn't.  I know

21   I made the letter itself a part of the record, and the

22   lawyers have referenced it.

23          But just so the transcript is clear, Mr. Ferris,

24   Juror Number 7 has given the Court a letter in which he

25   indicated that because of the fact that the defendant,

```
 1    Mr. Barrientos Nunez, was from Daytona Beach and because

 2    there was some reference that he had some association with

 3    the Perkins Restaurant in Daytona and that Mr. Ferris went

 4    to the Perkins Restaurant on occasion when he was playing

 5    high school football, had an affinity to people from

 6    Daytona Beach and affinity apparently for people that had

 7    an association with the Daytona Beach Perkins, he felt that

 8    he could not be fair and impartial under the circumstances

 9    and that he was biased in favor of the defendant.

10             And based on that representation as well as the

11    arguments of the lawyers, the Court is going to exclude

12    Mr. Ferris after I conduct an examination of him to

13    determine whether or not he's shared his views with any

14    other members of the panel.

15             (Juror Ferris entered the courtroom at 9:06 a.m.)

16             THE COURT:  All right.  We're back on the record.

17             Mr. Ferris is in the box with the rest of the jury

18    being segregated.

19             Mr. Ferris, I received your note this morning,

20    indicated that you felt you would not be able to be fair in

21    light of a bias that you feel has developed in favor of the

22    defendant.

23             Is that correct?

24             JUROR:  Yes, sir.

25             THE COURT:  Could you get the microphone, please,
```

```
 1   Mr. Carter?

 2           COURT SECURITY OFFICER:  Yes, sir.

 3           THE COURT:  All right.  When did this revelation

 4   come to you, Mr. Ferris?

 5           JUROR:  Well, when we originally introduced the

 6   defendant, through his connection in Daytona, immediately I

 7   thought something -- there was a connection there.  But I

 8   figured I can get over the bias because it's my duty.

 9           And then in the opening statements, when the

10   connection to Perkins -- because I grew up in Daytona and

11   went to high school, played college ball there as well.  We

12   did all our pregame meals at Perkins.

13           And on my long drive home back to Daytona, I just,

14   there's just -- I feel guilty for not being able to give an

15   unbiased side.

16           THE COURT:  Well, yesterday when the Court

17   inquired of you before you were impaneled as to whether or

18   not there was anything that you've heard this morning that

19   gives you worries about whether you could be impartial if

20   you were seated as a juror, you answered that question

21   under oath, no.

22           JUROR:  That was before opening statements, the

23   Perkins statement.

24           THE COURT:  So the association with Perkins?

25           Well, I'm going to excuse you, Mr. Ferris.  But I
```

```
 1    want to -- I am going to -- and I thank you for bringing
 2    this to our attention.
 3            But what I don't thank you for is referring to it
 4    as an inconvenience.  It's not an inconvenience.  If you
 5    look around the courtroom here, if you see the time, the
 6    money, and resources that have gone into getting this case
 7    to this stage, you had an obligation to answer those
 8    questions honestly under oath when we went through the voir
 9    dire process.
10            And, you know, I don't know -- I'm going to give
11    you the benefit of the doubt that this is a heartfelt
12    concern that you had, that you're bringing it to my
13    attention.  And I hope that that's true.
14            I hope it's not the drive to Daytona.
15            JUROR:  No.  Because I was actually looking
16    forward to the hotel.  Because they said they could
17    accommodate that.
18            But -- and it was the Perkins that brought the
19    connection.  If it was any other case, if there was no
20    connection to Daytona Beach Perkins, without hesitation.
21            THE COURT:  All right.  Well, you probably have
22    surmised that we don't have a -- we don't have an unlimited
23    number of expendable jurors before we have to mistry this
24    case and start it all over again from the beginning, doing
25    everything that happened up to this point over again.
```

1          So I want you to make sure you understand the

2     magnitude of that.

3          JUROR:  Yes, Your Honor.

4          THE COURT:  All right.  Would you stop off at the

5     jury assembly room on the way out, sir.  You're excused.

6          JUROR:  Thank you, Your Honor.

7          MR. DELLINGER:  Your Honor, may I approach?

8          THE COURT:  Oh, let me ask you something before

9     you go, Mr. Ferris.

10         Have you shared any of these views with any of

11    your fellow jurors?

12         JUROR:  No, sir.

13         THE COURT:  Have you mentioned to them at all that

14    you have any misgivings about your ability to be fair?

15         JUROR:  No, sir.

16         THE COURT:  You've not mentioned anything to them

17    about your association with Daytona or about your

18    misgivings with respect to your selection or anything of

19    that nature?

20         JUROR:  Only to Daytona is when I was --

21    introduced myself.  I haven't spoken to anybody else about

22    it.

23         THE COURT:  Okay.  But you haven't shared anything

24    about the fact that you feel you would not be able to be

25    impartial if you were seated as a juror?

```
 1              JUROR:  No, sir, I've not.

 2              THE COURT:  Okay.  Great.  Thank you.

 3              Counsel have any other follow-up questions to the

 4    Court's questions?

 5              MR. DELLINGER:  No, Your Honor.

 6              MR. CALDERON:  No, Your Honor.

 7              THE COURT:  All right.  Thank you.

 8              You're excused.

 9              JUROR:  I apologize.

10              (Juror Ferris exited the courtroom at 9:10 a.m.)

11              THE COURT:  Are you ready to proceed with

12    cross-examination?

13              MR. CALDERON:  Yes, Your Honor.

14              THE COURT:  Thank you.

15              MR. DELLINGER:  Your Honor, I hope you plan to say

16    something to the panel about the absence of their other

17    jury member.

18              THE COURT:  I'm going to give them a benign

19    explanation for why Mr. Ferris is not with them.

20              MR. DELLINGER:  Thank you, Your Honor.

21              THE COURT:  You're welcome.

22              MS. ROBERTS:  Your Honor, I was assuming that you

23    would want Mrs. Jara back in the box before the jury came

24    in but wanted to confirm.

25              THE COURT:  That's great.  Thank you for checking,
```

1    Miss Roberts.  Yes, ma'am.

2            Miss Jara, get back in the witness box, if you

3    would, please, ma'am.

4            (Jury entered the courtroom at 9:13 a.m.)

5            THE COURT:  Good morning, ladies and gentlemen.  I

6    hope you had a pleasant evening.  Thank you for being back

7    on time this morning.  It's much appreciated.

8            Were all of you able to follow my instructions not

9    to discuss the case amongst yourselves or with anyone else?

10           JURY:  Yes.

11           THE COURT:  You may notice that Mr. Ferris is

12   absent.  Mr. Ferris is absent because he had a personal

13   situation that developed over the evening that he brought

14   to my attention this morning, the details of which are not

15   important.  And I'm not going to share them with you

16   because it doesn't impact your further work in this case.

17           But because there was no other alternative, the

18   Court has excused him.  We have enough jurors to continue.

19   So we're going to continue in his absence.

20           We'll pick up with the cross-examination of

21   Mrs. Jara, where we left off yesterday evening.

22           Mr. Codner, if you'd like, you can slide down and

23   take up that empty seat just so you're not over there by

24   yourself.  I don't want you to feel like you're an

25   estranged man on an island over there.  It's very important

```
 1   that you all have a bond, so I want you to be sitting
 2   together.
 3              Who's going to do the cross-examination, you,
 4   Mr. Calderon?
 5              MR. CALDERON:  Yes, Your Honor.
 6              THE COURT:  All right.  You may inquire.
 7              MR. CALDERON:  Thank you, Your Honor.
 8              JURY:  Excuse us, Your Honor.  Notepads.
 9              THE COURT:  I'm sorry.  Let me get a microphone
10   for you.
11              Oh, the notepads.  I'm sorry.
12              All right.  Ladies and gentlemen, are you all set?
13              JURY:  Yes.
14              THE COURT:  Thank you very much.
15              You may inquire, Mr. Calderon.
16              MR. CALDERON:  Thank you, Your Honor.
```

<strong><u>CROSS EXAMINATION</u></strong>

```
18   BY MR. CALDERON:
19   Q    Mrs. Jara, good morning.
20   A    Good morning.
21   Q    Let me take you back to some of your testimony
22   yesterday.
23        You described when you entered the morgue.  Do you
24   recall giving that testimony yesterday?
25   A    Yes, I do.
```

```
 1   Q    And you said when you entered the morgue, is it
 2   correct that you saw several, possibly hundreds of bodies
 3   on the first floor; is that correct?
 4   A    On the ground floor.
 5   Q    On the ground floor?
 6   A    Yes.
 7        THE COURT:  Mrs. Jara, could you see that
 8   microphone in front of you?  If not, Miss Roberts, could
 9   you help her perhaps adjust that microphone?
10        THE WITNESS:  Oh.
11        THE COURT:  There we are.
12        MS. ROBERTS:  You got it?
13        THE WITNESS:  Is that all right?
14        THE COURT:  It's perfect.  Thank you very much.
15   Very helpful.
16   BY MR. CALDERON:
17   Q    And you said that there were several hundred bodies on
18   the ground floor, correct?
19   A    Yes.  In my estimate, yes.
20   Q    And you said that many of these bodies, they were the
21   bodies of young men wearing helmets; is that correct?
22   A    Some of them.
23   Q    And were these soldiers?
24   A    I don't know.  I shouldn't think so because they had
25   no -- they looked like workers to me.
```

1    Q    Okay.  Now, you said that also during your previous

2    testimony that you mentioned "La Segunda."  Is that a

3    newspaper?

4    A    That's a newspaper.

5    Q    And in addition to "La Segunda," was Victor Jara's

6    death publicized in other publications throughout the

7    country?

8    A    I have no idea.  I really don't know.

9    Q    You said that the obituary section included Victor

10   Jara on the days after the, after you visited the morgue;

11   is that correct?

12   A    It wasn't, it wasn't in the obituary section, I think.

13   But yes, I saw it in the newspaper.

14   Q    Did they also publish the death -- in the obituary

15   section, the death of other soldiers that had died during

16   the conflict?

17   A    I didn't see --

18          MS. ROBERTS:  Objection.  Mischaracterizes the

19   testimony.

20          THE COURT:  Can't hear you.

21          MS. ROBERTS:  That mischaracterizes the testimony.

22          THE COURT:  I still can't hear you.

23          MS. ROBERTS:  Objection, Your Honor.  The

24   defendant's counsel's question mischaracterizes Mrs. Jara's

25   testimony.

```
 1              THE COURT:  Thank you.
 2              Objection is overruled.
 3  BY MR. CALDERON:
 4  Q    Now, you had also mentioned that Victor Jara had been
 5  threatened prior to September 10th; is that correct?
 6  A    Was threatened?
 7  Q    Yes.
 8  A    Yes.
 9  Q    Okay.  And had he been detained by anyone prior to
10  September 10th?
11  A    No.
12  Q    Had he been questioned by anybody prior to
13  September 10th?
14  A    Anyone, I -- what does that mean?  I don't know.
15  Q    Questioned by possibly any agents, any police, anyone
16  like that?
17       I need a verbal response.
18  A    I'm sorry.
19  Q    A verbal response.
20  A    Sorry.  I don't understand.
21  Q    Let me ask you the question again.
22       Was he ever detained or questioned by anyone that you
23  perceived to be either a police agent or anyone else, a
24  government official?
25  A    No.
```

```
 1              MR. CALDERON:  Okay.  No further questions.

 2              THE COURT:  Thank you.

 3              Any redirect?

 4              MS. ROBERTS:  No, Your Honor.

 5              THE COURT:  All right.  Thank you.  Thank you

 6    Mrs. Jara.  You can step down.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  Your daughter is going to come up and

 9    give you a hand.

10              MS. ROBERTS:  Your Honor, could I request

11    assistance of the court staff in moving the podium back to

12    its normal location --

13              THE COURT:  Yes, ma'am.

14              MS. ROBERTS:  -- while we transition?

15              THE COURT:  Call your next witness.

16              MS. ROBERTS:  Plaintiffs call Manuela Bunster.

17              THE COURT:  Miss Bunster, would you come forward

18    and be sworn, please, ma'am.

19              That's fine right there.  If you could stop right

20    there, raise your right hand and be sworn, that would be

21    fine.

22              THE DEPUTY CLERK:  Please raise your right hand.

23              (Witness sworn.)

24              THE WITNESS:  I swear.

25              THE DEPUTY CLERK:  Please take the witness stand.
```

1          THE COURT:  Miss Bunster, adjust your chair and

2     the microphone, if you would, please, so you're speaking

3     directly into it.

4          THE DEPUTY CLERK:  Okay.  Please state your name

5     and spell your last name.

6          THE WITNESS:  My name is Manuela Bunster, and it's

7     spelled B-O-N-S-T-E-R.

8          THE COURT:  You may inquire, Miss Roberts.

9                    **DIRECT EXAMINATION**

10    BY MS. ROBERTS:

11    Q    Good morning, Miss Bunster.

12    A    Good morning.

13    Q    I believe I misheard the way you spelled your last

14    name.  Could you spell that one more time?

15    A    My surname?

16    Q    Your surname.

17    A    B-U-N-S-T-E-R.

18    Q    Thank you.

19         What is your relationship to this case?

20    A    I'm a plaintiff, one of the plaintiffs.

21    Q    And when were you born?

22    A    Can I say something before we start?  I'm sorry.

23    Q    What would you like to say before we start?

24    A    Well, it's very difficult to sit here --

25              THE COURT:  I'm sorry, Miss Bunster.  We need to

```
 1   answer questions.
 2              THE WITNESS:  Okay.
 3              THE COURT:  So your lawyer will ask you a
 4   question, and you can answer.  If she has questions to ask
 5   you, you just need to listen to the questions and answer
 6   those.
 7              THE WITNESS:  Fine.  Sorry.
 8              1960.
 9   BY MS. ROBERTS:
10   Q    And where were you born?
11   A    I was born in Santiago, Chile.
12   Q    Where do you live now?
13   A    In Santiago.
14   Q    What do you do for a living?
15   A    I'm a director of a dance school, university degree in
16   Santiago.
17   Q    And are you married?
18   A    Yeah.
19   Q    Do you have any kids?
20   A    Four.
21   Q    Is there anything that you would like to say before we
22   start into your testimony today?
23   A    Yes.
24   Q    What's that?
25   A    Well, I want to express, extend my condolences to the
```

```
 1   families of all of the people who died.
 2            MR. CALDERON:  Objection, Your Honor.
 3            THE COURT:  Thank you.  Thank you very much,
 4   ma'am.
 5            Ladies and gentlemen, I'm going to ask you to step
 6   out for just a minute, if I could, please.
 7            (Jury exited the courtroom at 9:22 a.m.)
 8            THE COURT:  I asked our jury to step out,
 9   Miss Bunster, because the reason I stopped you at the
10   outset is because I was fearful that that was something
11   that was coming.
12            I understand that it may be -- but I'm confident
13   that it is a heartfelt gesture.  It's completely
14   inappropriate --
15            THE WITNESS:  Okay.
16            THE COURT:  -- in a court of law where the jury is
17   here to make a decision with respect to the issues in your
18   case --
19            THE WITNESS:  Oh, sorry.
20            THE COURT:  -- to prey upon the jury's sympathy or
21   prejudice or attempt to elicit.  That is completely
22   improper.
23            THE WITNESS:  I'm sorry.
24            THE COURT:  So that's the reason I stopped you at
25   the first instance.
```

1          And, Miss Roberts, I want the lawyers to hear this

2    as well.  I do not want that happening again.

3          MS. ROBERTS:  Understood, Your Honor.

4          THE COURT:  Understood?  And that's on both sides

5    of the courtroom.  It's completely inappropriate.  And I do

6    not want it happening again.

7          THE WITNESS:  Yeah.  Sorry.

8          THE COURT:  Understood?

9          MS. ROBERTS:  Yes.

10         THE COURT:  Let Mr. Carter know to bring our jury

11   back.

12         (Jury entered the courtroom at 9:25 a.m.)

13         THE COURT:  Ladies and gentlemen, welcome back.

14         Prior to your departure, Miss Bunster made a

15   comment from the witness stand expressing sympathy for the

16   victims of the tragedy in Orlando.

17         Everybody in the courtroom feels a sense of

18   sympathy and condolence for the victims of the tragedy in

19   Orlando.  I'm confident that that's true.

20         It has absolutely nothing to do with any of the

21   issues that are for your determination in this case.

22         The sentiments of prejudice and sympathy have no

23   place in a court of law.  They have lots of places in other

24   aspects of our lives but not in here.

25         So I'm going to instruct you later on in the case

```
 1   that prejudice or sympathy for or against any of the
 2   parties is not appropriate and it is not to be a part of
 3   your deliberations.
 4          So with that advisory, let's continue with the
 5   examination.
 6          Miss Roberts?
 7   BY MS. ROBERTS:
 8   Q    Miss Bunster, how many brothers and sisters -- pardon
 9   me.  How many brothers and sisters do you have?
10   A    I have one sister.
11   Q    And what's her name?
12   A    Amanda Jara.
13   Q    And who was your biological father?
14   A    Patricio Bunster.
15   Q    And who raised you?
16   A    Joan and Victor.
17   Q    I'd like to ask you and the jury to take a look at the
18   exhibit previously entered into evidence as Joint Exhibit
19   Number 29.
20          Once we get the technology working, I'd like you to
21   describe what you see in this photo.  Who are the people in
22   the photo?
23   A    My mother; my father; Amanda, my sister; and me.
24   Q    Is there anything else you can tell us about this
25   photo?
```

```
 1   A    It was taken in a garden in around 1972.

 2   Q    Now, turning to an exhibit previously entered into

 3   evidence as Joint Exhibit Number 46, what can you tell us

 4   about this photo?

 5   A    My parents, my parents.  That was taken around 1961

 6   when I was one years old.  It's in Vina.  And it's a very

 7   traditional type of photograph taken in parks.

 8   Q    Miss Bunster, to your knowledge, did your mother ever

 9   record her experience of life with your father from that

10   time or before you were born?

11   A    Yeah, she did.  She wrote a book which was published

12   in 1983 in London the first time.  It's called "Victor, an

13   Unfinished Song."

14           MS. ROBERTS:  Your Honor, I'm going to ask the

15   jury to read this book electronically.  But it will be

16   easier for Miss Bunster if she reads it physically.

17           Do I have permission to approach her with the

18   book?

19           THE COURT:  Is it a relatively short recitation?

20           MS. ROBERTS:  Very short.

21           THE COURT:  Okay.  Do you have an exhibit number

22   for me, Miss Roberts?

23           MS. ROBERTS:  I'm sorry.  "An Unfinished Song, the

24   Life of Victor Jara" was previously admitted into evidence

25   as Joint Exhibit Number 92.  There are several excerpts.
```

```
 1              THE COURT:  Thank you.
 2   BY MS. ROBERTS:
 3   Q    Miss Bunster, I'd like you to please read the second
 4   full paragraph on page 57.
 5   A    "Victor had admired me from afar for a long time, had
 6   fallen in love with me, according to him, when he saw me
 7   dance for the first time.
 8        "It may seem contradictory that someone so
 9   passionately interested in things Chilean as Victor should
10   have fallen in love with a gringa; or it might seem that he
11   had fallen for the romantic ideal of me as a dancer rather
12   than the real woman.
13        "But it wasn't so.  It is often possible to perceive
14   the essence" --
15              THE COURT:  Miss Bunster, can you read a little
16   bit more slowly, please.  The court reporter has to try to
17   keep up with you.  If you can just slow it up a little bit,
18   I would appreciate it.
19              THE WITNESS:  Okay.  I didn't want to take up too
20   much time.
21        "Victor had admired me from afar for a long time,
22   had fallen in love with me, according to him, when he saw
23   me dance for the first time.
24        "It may seem contradictory that someone so
25   passionately interested in things Chilean as Victor should
```

```
 1   have fallen in love with a gringa; or it might seem that he

 2   had fallen in love -- for the romantic ideal of me as a

 3   dancer rather than the real woman.

 4           "But it wasn't so.  It is often possible to

 5   perceive the essence of people when you see them dancing,

 6   without the barriers of language, of different customs and

 7   inhibitions.  And for me, dance was my only real form of

 8   expression."

 9   Q   Now, could I ask you to please turn to page 58 and

10   read starting from the second full paragraph ending with

11   the first full paragraph on page 59.

12           This will be the last excerpt.

13   A   Okay.

14           "Victor was gentle and patient and funny, sometimes

15   sulky and neurotic if I hurt him.  But his bad moods didn't

16   last long.  At first, if we quarreled he would disappear,

17   sometimes for days on end.  And I knew that he had gone off

18   to Poblacion Nogales to be with his friends.

19           But on the whole, he was a very -- he was very

20   generous with himself.  Although most other people describe

21   him at this point of his life as very reserved, with me he

22   wasn't like that.  He hid nothing.  I didn't feel that his

23   smile was a defensive mask, but rather open, generous

24   happiness, infectious happiness.

25           "When he wasn't about, or was late in arriving, I
```

1    began to realize how much I was relying on him emotionally

2    and even began to think that I was really falling in love

3    with him, although I was to wary to use that term.

4        "So the spring passed and summer began.  It was New

5    Year's Eve, and Victor was invited to a party.  He asked me

6    to go with him.  And this was the first time I met his

7    friends of the theater school, not as their teacher, but as

8    Victor's companera.

9        "What I most remember about the party is Victor

10   singing.  He was asked insistently, and eventually allowed

11   himself to be persuaded.  He sang songs from the Chilean

12   folklore, most of which were new to me because he had

13   collected them himself on his visits to Nuble and other

14   parts of the country, and from Argentina songs about the

15   Atahualpa Yupanki.

16       "If I wasn't already in love with him, with Victor

17   before then, his singing put an end to my resistance.

18       "I can't say that he became another person, but he was

19   transformed.  He became himself with wings.  He showed all

20   his warmth, his tenderness, his passion, his capacity for

21   fun.  His warmth, his tenderness, his passion, his capacity

22   for fun.

23       "His voice expressed all these things, as well as

24   strength.  I looked at him embracing his guitar, bent over

25   it, or looking up and out, seeing the pulsing of his

1    throat, his eyes closed in concentration or looking at me

2    across the room as he sang song after song.

3         "My defenses collapsed.  A great happiness welled out

4    of me.  I felt like shouting and singing.  And when after

5    midnight had sounded he embraced me and in English wished

6    me very tenderly Happy New Year's, I knew that the final S

7    was not a mistake.  It was a nice way of putting it."

8         I'm sorry.

9    Q    Miss Bunster, I'd like to show you and the jury the

10   photo that was previously entered as Joint Exhibit

11   Number 24.

12        What can you tell us about this photo?

13   A    That was -- that's in the back -- a room of our house

14   at the back of the garden, in a small studio where my

15   parents worked.

16        My mother was a dance teacher, used to prepare her

17   classes in there.  And he used to work, compose, and also

18   rehearse with different music groups at the back.

19        That must have been taken in 1972 also.

20   Q    What kind of person was Victor?

21   A    Well, as a father, he was a very gentle and caring

22   father.  He was fun and loving.

23        I think what I most cherish really from that time,

24   especially the last period, you know, was his capacity to

25   make you feel really -- that your opinions really mattered,

```
 1  you know.

 2       He would ask me about almost -- I mean, different --

 3  my opinion about many things, you know.  From trivial

 4  things, domestic things, to things to do with his work, his

 5  songs, his records.  You know, events that were occurring

 6  in Chile at the time.

 7       I felt really appreciated, sort of valued.  That

 8  basically is what I most remember.

 9  Q    Let's take a look at the exhibit previously entered

10  into evidence as Joint Exhibit Number 47.

11       What can you tell us about this photo?

12  A    Oh, that's a photograph taken by him, of my mother

13  with us two.  And that must be in the south of Chile in

14  Lago Lanalhue and on a holiday.

15  Q    Can I just ask you to clarify when you say him and us,

16  who are you referring to?

17  A    My sister and my mother.

18  Q    Okay.  Let's take a look at Exhibit 48.  What can you

19  tell us of this one?

20  A    It was the other way around.  That was taken by my

21  mother.  And it's him with my sister and me.

22  Q    And, finally, I'd like you to take a look at Joint

23  Exhibit 51, also previously entered into evidence.

24       What can you tell us about this photo?

25  A    That's my father probably cleaning or washing the car.
```

```
1    It seems like it.  And I'm just standing next to him.

2    Q     Who took the photo?

3    A     I don't know.  I think maybe my mum.  I can't imagine

4    who else it could be.

5    Q     And about how old were you at the time?

6    A     Three.

7    Q     What song of your father's would you most want the

8    jury to hear?

9    A     Well, I would have liked to play several because they

10   really reflect what a man personally he was.  But I've

11   chosen one in particular, a song which he composed in 1973.

12        It's called "When I Go to Work," Cuando voy al

13   Trabajo.

14        And he composed it.  It was inspired in Roberto

15   Ahumada, a young building worker who was murdered in a

16   march for peace against a threat of fascism in Chile.

17             MR. CALDERON:  Your Honor, I'm going to object.

18   Relevance.

19             THE COURT:  Relevance?

20             MR. CALDERON:  Yes.

21             THE COURT:  Sustained.

22             MS. ROBERTS:  May I present argument in that?

23             THE COURT:  No, ma'am.

24             THE WITNESS:  What?

25             THE COURT:  Ask a new question.
```

```
 1   BY MS. ROBERTS:
 2   Q    So we have to go to the next question.
 3        When did you discover this song had been written by
 4   your father?
 5   A    Well, I discovered this song after he was killed.  The
 6   first time I listened to it was after he was killed.  It
 7   was part of a set of eight songs that had been composed
 8   during that year, and that we heard, that were smuggled out
 9   of Chile by a Swedish television crew.
10        And we heard them after he had been killed.  I think
11   this song is also a song for my mother.
12            MS. ROBERTS:  Your Honor, I'd like to play what
13   was previously entered into evidence as Joint Exhibit 111,
14   which is "When I Go to Work."
15            At the same time we'd like to display English
16   language translation of the lyrics.
17            THE COURT:  Okay.  Any objection, Mr. Calderon, to
18   the lyrics display?
19            MR. CALDERON:  No, Your Honor.
20            THE COURT:  All right.  You may proceed,
21   Miss Roberts.
22            (Playing audio exhibit.)
23   BY MS. ROBERTS:
24   Q    Miss Bunster, what does your father's music mean to
25   you on a personal level?
```

1    A    Well, his songs have helped me to survive through the

2    pain of his loss.

3         And also clearly his songs reflect -- or depict,

4    reflect, represent the lives of many, many people in Chile

5    and in the world.

6         That's just to me.

7    Q    Let's take a look at what's been previously admitted

8    into evidence as Plaintiff's Exhibit Number 1.

9         Could you describe what you see in this picture?

10   A    This is a -- it must have been taken in the period he

11   was making a record he'd been asked to create around and

12   about the history of that shanty town.

13        THE COURT:  It's actually not in evidence yet.  I

14   overruled the objection.  But if you're offering it into

15   evidence, it can be received.

16        MS. ROBERTS:  I'm sorry, Your Honor.  I'd like to

17   move Plaintiff's Exhibit 1 into evidence.

18        I misunderstood.

19        THE COURT:  That's fine.  Over the defense

20   objection, Plaintiff's 1 is received.

21        (Plaintiff's Exhibit 1 was received

22         in evidence.)

23   BY MS. ROBERTS:

24   Q    I'm sorry.  Was your answer complete?  Were we

25   interrupting you?

```
1    A    Okay.  Okay.

2    Q    Okay.  Let's take a look at what's previously been

3    entered into evidence as Joint Exhibit Number 26.

4         Approximately when was this photo taken, do you think?

5    A    This must have been in 1969.  It was before the

6    election of Salvador Allende in 1970.

7         It's a demonstration.  It must be May Day or

8    something.

9    Q    Did you ever see your father perform at these kinds of

10   demonstrations?

11   A    Yeah, lots of times, apart from the concerts.  But

12   yeah, he did.

13   Q    And, finally, let's take a look at what was previously

14   entered into evidence as Joint Exhibit Number 41.

15   A    Clearly, he's not singing.  He's demonstrating, being

16   part of a march.  He's probably with the workers of the

17   university, Technical University.  It's a march from 1973

18   also, which warned about the --

19             MR. CALDERON:  Objection, Your Honor.

20             THE WITNESS:  Yeah.

21             MR. CALDERON:  Speculation.

22             THE COURT:  I can't hear you.  I'm sorry,

23   Mr. Calderon.

24             MR. CALDERON:  It's speculation.

25             THE COURT:  Objection is overruled.
```

```
 1   BY MS. ROBERTS:

 2   Q    So you can continue with your answer.

 3   A    It's a march.  I was there.  I was in a march, in that

 4   same march on that same day with him.  He was marching with

 5   a -- his fellow workers from the Technical University.  And

 6   it was a march which had to do with the threat of civil war

 7   or fascism in Chile.

 8   Q    Okay.  I'd like to -- I apologize.

 9        Directing your attention now to September the

10   11th, 1973, what noteworthy event happened in Chile on

11   that day?

12   A    There was a military coup.

13   Q    Where were you living at that time?

14   A    In Santiago, in Chile with my parents.

15   Q    I'd like -- my apologies.

16        I'd like to ask you to take a look at an exhibit

17   previously entered into evidence as Joint Exhibit

18   Number 56.

19   A    That was our home.  And it's my mother's home now.

20   Q    Were you living there then?

21   A    Yes.

22   Q    Let's also take a look at what was previously entered

23   as Joint Exhibit Number 57.

24        What can you tell us about this photo?

25   A    That's the staircase in my home, at the entrance of my
```

```
 1   home.
 2   Q    What do you recall about the day the coup began?
 3   A    Oh, well, it started like a normal day for us, for my
 4   sister and me.  We went to school.  My mother took us to
 5   school in the morning.
 6        When I got to school, I did -- there were a lot of
 7   rumors going on about there was military movements and --
 8   outside Santiago.  And -- but they weren't very clear, you
 9   know.
10        And my mother came to fetch us in about an hour later
11   or so, or an hour and a half later, and she took us back to
12   home.
13   Q    What was your understanding or how much -- how much of
14   an understanding did you have of what was going on?
15   A    Well, being we weren't -- you know, I was only -- I
16   was 13.  I was 13.  But I had been at -- I had been -- I
17   was conscious that something was happening, that something
18   would happen eventually, because there had been an
19   attempted military coup in July of that same year.
20        So that's where it was, you know, in that way for me
21   at that age.
22   Q    Do you remember what your father did on that day?
23   A    Well, he was listening to the radio when we got home,
24   at the back of the studio, at the back.
25        And he left home that day.  In the morning, he left
```

1    home.  He crossed from the studio and went out of the --

2    out of the room, our house.

3    Q    Were you personally aware of any military activity

4    that day?

5    A    Yes.  But later on.  Not at that -- not at that stage.

6    Q    When did you become personally aware of military

7    activity?

8    A    Well, later on that morning, we started to hear

9    helicopters and seeing helicopters flying very low, on top

10   of our house.  And it wasn't because of us, obviously.

11   Because we lived near Allende's house.  So we heard a lot

12   of gun shooting.  We saw a lot of Hawker Hunters flying

13   over and towards the mountains.

14       I saw a big thing being dropped from one of them.  But

15   I never knew afterwards what would -- what had happened,

16   you know, towards the mountains.

17       It was quite frightening for -- because, I mean, we

18   didn't know really what was going on.  I hadn't heard the

19   decrees, the bands, the military.  I wasn't listening to

20   the radio.

21       I just -- I could just feel this and see this, you

22   know.  But I wasn't understanding really the measure of

23   what was going on.

24       It was just a frightening experience for us.

25   Q    So yesterday we heard your mother testify about the

```
 1    days in between when your father left and when Hector

 2    Herrera came to the house.

 3         What do you remember about those days of waiting?

 4    A    Well, there was a curfew at some point in the day.

 5    You know, you couldn't go out of the house, you know.

 6         On television, they were showing very proudly that we

 7    had television -- when all the channels are transmitting

 8    the same thing, you know.  The military decrees, the

 9    burning of books.  You know, the soldiers burning books,

10    you know in the streets.

11         The bombing of La Moneda palace, which is, as they

12    said yesterday, like the White House of your country.  By

13    Hawker Hunters, bombing the La Moneda palace.  And they

14    were showing this all day, all day, all day, all day on

15    television.

16         It was frightening, you know, to see what was going

17    on.  But at that point for me, the only -- that was the

18    information we had, you know.

19         And, also, Allende's house, the president, being

20    destroyed.  They showed it.  They showed it on television

21    all day, repeatedly.  That was everything.

22         So we started to hide Victor's records.  We started to

23    hide posters, his posters, everything that -- that, you

24    know, that was related to him, out of fright.

25    Q    How did you learn that your father died?
```

```
 1   A    Well, I overheard my mother speaking to a friend of

 2   hers who had been caught by the curfew in our home.  When

 3   she came back from the morgue, she was telling her what she

 4   had seen.

 5        And I was sitting on the staircase.  But I was sort of

 6   hiding.  I overheard it at that point.  But also there had

 7   been rumors before that.  You know, yeah.

 8        I remember an actor coming over before that, Julio Yun

 9   who came over and sort of said, that he heard he had been

10   found in the morgue.

11        But everything was very vague for me at that point.

12        But when I knew -- I knew, it was when I heard my mom

13   describing to Quena, her friend, what she had seen.

14   Q    I'm sorry.

15   A    That's all right.

16   Q    At any point did you go back to school?

17   A    Yes, I did.  About two weeks later, one week.  I don't

18   know.  I sort of needed to -- I needed to see my friends,

19   try to sort of go back to a more normal situation, you

20   know.

21        But I got to school and discovered that what was

22   happening to us was happening to many other people.  I saw

23   my teachers who had gone back to work after being beaten --

24             MR. CALDERON:  Objection, Your Honor.  Relevance.

25             THE COURT:  Objection is overruled.
```

```
 1              You can answer the question.

 2              You can finish your answer.

 3              THE WITNESS:  Yeah.  Well, the thing I was going

 4    to say is that that was the moment I discovered that we

 5    weren't the only ones, you know.

 6              Students from my school were imprisoned, beaten

 7    up, my teachers.  The director of the school had been

 8    detained, taken with a helicopter, you know, away.

 9              And many people also had asked for asylum, you

10    know, in different embassies.  So many families of the

11    school had, you know, already was sort of, some of them

12    getting out of Chile, et cetera.  But --

13    BY MS. ROBERTS:

14    Q    How long did you and your family stay in Chile after

15    that?

16    A    We left Chile on the 15th of October.

17    Q    And how did you leave Chile?

18    A    What do you mean how?

19    Q    Literally, how did you get from your house to out of

20    Chile?

21    A    Well, we were taken, we were taken by the British

22    Consul.  He came to fetch us up at our house and put us in

23    the door of the plane.

24    Q    And what was your understanding at the time of how

25    that came to be?
```

```
 1   A    Well, my mother had tried to get help from the British

 2   Embassy before Victor was killed.  And he -- well, she

 3   tried but wasn't -- you know, she was told that, you know,

 4   that wasn't possible because he wasn't a British citizen.

 5        But as soon as they knew that he had been murdered,

 6   they suggested that she should leave the country.  And this

 7   is how it happened, you know, that the Consul took their --

 8   away, to protect us.

 9   Q    And what did you take with you?

10   A    We took three suitcases basically filled with Victor's

11   life, photographs, manuscripts, letters, and some clothes.

12   Q    And how did you feel about leaving Chile at that time?

13   A    I think my mother tried to play it down a bit, you

14   know.  And she kept saying, We'll be away just for one

15   year, you know.  This can't be happening.  It won't be

16   long, you know, before we're back, because this can't last,

17   you know.

18        This can't -- so I think she sort of tried to

19   maintain.  But obviously we were leaving our friends, our

20   home.

21        It felt really lonely to be sitting on that plane, the

22   three of us by ourselves, you know.  That was the sense at

23   that moment.

24   Q    And in the year or so after you left Chile, do you

25   recall your mother giving any interviews or doing any
```

```
 1   public speaking?

 2   A    Yes, she did.

 3        From the first moment she started to talk about what

 4   was going on in Chile, I thought her very bravely -- she's

 5   a really shy person.  And she started to do it, to do it,

 6   to do it, to talk everywhere about what was going on.  Not

 7   to ask, just to, you know, but the horrors of what was

 8   going on in Chile.

 9        And she did, yeah, she did lots of interviews.

10            MS. ROBERTS:  Your Honor, I'd like now to play for

11   the jury an excerpt of Campanera Victor Jara previously

12   entered into evidence as Joint Exhibit 66, but just

13   starting at a minute, 14.  14 minutes and 5 seconds.  It's

14   a very short excerpt.

15            THE COURT:  All right.  You may proceed.

16            (Playing video exhibit.)

17   BY MS. ROBERTS:

18   Q    What was your mother like in the first year after you

19   moved away from Chile?

20   A    I felt her very fragile, sad, profoundly sad, and

21   vulnerable.

22        But, on the other hand, she had an immense strength.

23   And admire her, really admire her for that.

24        She did all that was in her power to communicate, as

25   what I said before, what was going on.  It was hard for
```

1  her.  She had to testify at lots of human rights tribunals

2  all over the world and give her testimony, you know.

3       And that's hard to go over it, you know.  Each time

4  you relive, you know, the horror.

5       But this is how she was at that time, intimately felt

6  it.  I felt it in a different way.  I wanted to protect

7  her.

8       But she was very strong.  She had to speak to

9  thousands of people in different parts of the world.

10 Q    How about your sister?

11 A    Well, I think we just became really close, all three

12 of us.  We had to give ourselves the strength.  And she

13 was -- she must have been suffering a lot.  But she was

14 eight, you know.

15      I felt her, a great need to protect her also.

16 Q    What did you miss most about your life in Chile?

17 A    Everything really.  Everything.  Everything.  I wanted

18 to go back.  I always wanted to go back.  All the time.  I

19 wanted to go back.

20 Q    What did you learn about the details of your father's

21 death during that first year?

22 A    I mean, I heard Joan's description of how she'd found

23 him, yeah.

24 Q    When did you return to Chile?

25 A    In 1991, yeah.  Eight years before Pinochet was out.

```
1    Q     How old were you at the time?

2    A     Twenty-one.

3    Q     And why did you return to Chile at that time?

4    A     Because I always wanted to be there, back there.  And

5    I needed to be there also to -- I felt a need to do

6    something also about, to do something for the democracy to

7    return to Chile also.

8    Q     What was it like to be back in Chile at that time?

9    A     Oh, it was frightening in some ways.  But, also, you

10   felt part of a, of a movement, you know, to recover, for

11   the recovery and democracy.

12         But there's a lot of repression.  I mean, people who

13   oppose the regime were constantly repressed.  I mean, there

14   wasn't -- you couldn't -- censorship.  There was whatever,

15   you know.

16         All the things that really -- but we had a very strong

17   repression.  People were killed.  People were imprisoned,

18   you know, detained, disappeared.  Everyone who did

19   something against the dictatorship of Pinochet could -- was

20   at risk of all those things I just described.

21   Q     So I'm going to skip ahead a little bit, a few years.

22         When were your father's remains exhumed?

23   A     In 2009.

24   Q     And what did you expect to get from the exhumation?

25   A     Evidence.
```

1   Q    Directing your attention to the day that your father

2   was exhumed, what happened first?

3   A    Well, we were there when his remains were exhumed at

4   the general cemetery, yes.

5       I know my mother was sort of slightly apprehensive.

6   Because he -- well, he had been buried there.  We had been

7   away a long time.  And she was apprehensive that eventually

8   it might not be him or that they had changed him from that

9   place, et cetera.

10      But we were there expecting to see him.

11  Q    And what did you see when they opened the coffin?

12  A    I saw his body, his bones.

13  Q    Did you recognize him?

14  A    I felt it with him.  I can't say I sort of recognized

15  him.  But I felt it was him.  I was -- yeah.

16  Q    What else went through your mind after you recognized

17  him?

18  A    I realized how much I needed to see him, because as we

19  hadn't been in his burial the first time.  When -- it was

20  something that we both felt, my sister, after we talked

21  about this.  We hadn't -- with all of that time that had

22  gone past, we hadn't realized how much that was lacking,

23  you know, in our life.

24      So actually to see him and, you know, recognize he was

25  dead, you know.  And I felt other people who in Chile had

```
 1    never found the remains of their loved ones, you know.
 2         And many people in Chile have disappeared and their
 3    loved ones, their families haven't found their bodies.
 4    They don't know what happened to them.  And that's
 5    something that occurred to me at that point also.
 6    Q    Miss Bunster, I want to ask you and the jury to take a
 7    look at a couple of photos of your father's remains as they
 8    were found at the exhumation.
 9         Is that all right?
10    A    Yes.  I've seen them.
11    Q    Okay.  Take a look at Joint Exhibit 14.
12         15.  Sorry.
13         Do you recognize this photo?
14    A    Yes.
15    Q    And what is it?
16    A    His skull.  His skull.
17    Q    Can we take a look at Joint Exhibit 97?
18         And can you tell the jury what you see in this photo?
19    A    Sort of the rest of his body covered with some sort of
20    clothing.  The rest of his clothes were at the bottom of
21    the coffin.
22    Q    Let's take that down.
23         After the exhumation, what happened next?  Or after
24    they opened the coffin, what happened next?
25    A    There was a period of -- they took him away from us.
```

1    Q     Where did they take him?

2    A     To the medical service, the Servicio Medico Legal,

3    legal-medical service to do --

4    Q     Did they take his remains to do expert analysis?

5    A     Yes.

6    Q     When were your father's remains returned to you?

7    A     Seven months later.  Seven months later.  Yes.  Before

8    they -- I was able to see him, the remains, you know,

9    before we actually put him in a coffin --

10   Q     And what did your family --

11   A     -- displayed on --

12   Q     I'm sorry.

13   A     -- displayed orderly on a table at the medical

14   service.

15         This is when I actually understood.  I could see

16   because he wasn't killed by two bullets.  But there was 44,

17   42 more bullets that had riddled his body.

18         So it was then I realized how much you could see his

19   broken ribs and the whole of his body and his bones, broken

20   by bullets.  Yep.

21   Q     What did your -- I'm sorry.  What did your family

22   decide to do with the remains when they were returned to

23   you?

24   A     Well, we would have liked to have a private, probably

25   a more private time, you know, to ourselves with him.  But

```
 1   obviously, there had to be a funeral, because Victor is
 2   very, very, very much loved by his people.
 3       And so we had a wake of -- three days long wake.  And
 4   Victor had a foundation where there were thousands of
 5   people.  It was a very popular wake, funeral.  There was a
 6   lot of music and dancing.
 7       And after three days, there was a massive, massive
 8   funeral in which, I don't know, it was enormous, enormous.
 9   Q   What was it like for you to attend his funeral?
10   A   It was very demanding.  But also, I mean, we walked
11   six hours because it was so enormous, you know.  It was
12   like 25 blocks of people walking slowly towards the
13   cemetery.  So it was a bit stressful.
14       My mom, my mom walked the six hours too.  So it was
15   really, really, really -- we knew he was loved that way,
16   you know.  But I mean, when it happened, it was really --
17   what would the word be?  I don't know.
18       We were happy that we had actually done it, you know.
19   It was really necessary because -- yeah.
20           MS. ROBERTS:  Your Honor, I'd like to play for the
21   jury what was previously entered into evidence as Joint
22   Exhibit Number 65, which is an excerpt from Victor Jara,
23   N-2547, starting at minute -- 2 minutes and 29 seconds.
24           THE COURT:  You may proceed.
25           MS. ROBERTS:  Thank you.
```

```
 1              (Playing video exhibit.)
 2   BY MS. ROBERTS:
 3   Q    How well does this recording capture the funeral for
 4   you?
 5   A    Not too well, really, because --
 6   Q    Why is that?
 7   A    Well, you can't see, you know, that -- that's a moment
 8   when we went out.  But then, you know, there was a really,
 9   really long, long, long, long procession, procession with a
10   lot of music and a lot of dancing.
11       But yes, that's the first moment when we went out of
12   the Foundation.  We didn't -- there was no control because
13   it was definitely overwhelming.
14   Q    What was the significance of this funeral?
15   A    Well, I think for the people of Chile, it was very
16   significant and very, a very necessary moment because this
17   hadn't happened before.
18       In '73, Joan had buried him just with her two friends,
19   you know.
20       But -- and it was necessary.  For us, it was another
21   step in the process of closure, yeah, after the exhumation,
22   the funeral.
23   Q    And did the funeral provide a sense of closure for
24   you?
25   A    Yes, part of it.  Yeah.  In a way, yes, yes.  All of
```

```
 1    this expression also of the love of the people of Chile for
 2    him is what helped -- I mean, gave me that sense of
 3    closure.
 4    Q    And what's missing if it's only a part?  What's
 5    missing?
 6    A    Justice.  Justice.  Justice.  That the person or the
 7    persons who did this account for it.
 8    Q    How has your father's death and its surrounding
 9    circumstances impacted you?
10    A    I can't, I can't reduce that question into an answer
11    which -- I think the most, the most painful thing for us or
12    for many families in Chile is impunity, basically to live
13    with that throughout so many years.
14         Basically, I think that's what is the most damage,
15    really, for us, you know, the damages of impunity, you
16    know.
17    Q    What do you miss most about your father?
18    A    His presence.  There's nothing -- I've missed him.
19    I've missed him in different ways during my life, in
20    different stages of my life, you know.
21         I missed him during the years of the dictatorship.  I
22    missed him -- I've missed him every time I've given birth,
23    you know.  Different important moments, you know, in my
24    life.
25         You know, his voice, his friendship, his friendship.
```

```
 1   Q    If you could tell your father anything right now, what
 2   would you say to him?
 3   A    That he had a great woman next to him, a very strong
 4   woman who fought 43 years for sorting out, seeking for the
 5   truth and justice in his murder and that we and his people
 6   are going to do anything and we will do everything that's
 7   necessary, as we have done, to find justice for his murder
 8   and that his song has lived on in Chile and in the world.
 9             MS. ROBERTS:  I have no further questions.
10             THE COURT:  Ladies and gentlemen, let's take our
11   morning break.  It's almost at the 90-minute mark.  We'll
12   take a 15-minute break and come back at 10 minutes until
13   11:00.  And we'll take cross-examination.
14             Will there be cross-examination of this witness,
15   Mr. Calderon?
16             MR. CALDERON:  Yes, Your Honor.
17             THE COURT:  All right.  We'll come back for the
18   cross-examination at 20 till, 20 till.
19             (Jury exited the courtroom at 10:22 a.m.)
20             THE COURT:  We'll be in recess.
21             (Recess at 10:22 a.m. to 10:41 a.m.)
22             THE COURT:  Back on the record in Jara versus
23   Barrientos Nunez, 14-civil-1426.
24             Court notes all counsel and parties are present.
25   The witness is in the witness box.
```

```
1              Bring our jury back, please, Mr. Carter.

2              (Jury entered the courtroom at 10:43 a.m.)

3              THE COURT:  Welcome back, ladies and gentlemen.

4              Cross-examination, Mr. Calderon?

5              MR. CALDERON:  Thank you, Your Honor.
```

**CROSS EXAMINATION**

```
7   BY MR. CALDERON:

8   Q    Good morning, Mrs. Bunster.

9   A    Hello.

10  Q    You stated earlier that you were present when your

11  father's body was exhumed; is that correct?

12  A    Yes, yes.

13  Q    And do you recall what date that was?

14  A    I think it was the 6th of June, 2009.

15  Q    And that was in 2009?

16  A    Yes.

17  Q    Okay.  And the video clip that we just saw, that, is

18  it correct to say that that was -- that that actually

19  happened on December 2nd of 2009?

20  A    No.  It must have been the 5th of December.

21  Q    The 5th of December?

22  A    Yes.  I think the 5th of December.  Yes.  I think

23  the wake started on the 3rd.  It lasted three days.

24  And then on the 5th, that funeral started.

25  Q    And were you made aware of the findings of the medical
```

```
 1   examiner's report after the exhumation of the body?

 2   A     After the exhumation?

 3   Q     Yes, ma'am.

 4   A     Straight after?

 5   Q     Were you made aware after the exhumation of the body

 6   of the medical examiner's findings?

 7   A     After the results came?

 8   Q     Were you made aware of the results?

 9   A     When?

10   Q     After the exhumation of the body.

11   A     In June, you mean?

12   Q     After June.

13   A     After June is June, December, August.  I don't

14   understand your question.

15   Q     It's a very simple question.  It's a yes-or-no

16   question.

17   A     It's the process of exhumation, because exhumation, I

18   mean, it took seven months of that investigation.  So I

19   want to know exactly when are you asking me.

20         THE COURT:  The question right now, the question

21   right now for you, Miss Bunster, is at any time after the

22   body was exhumed, were you made aware of the medical

23   examiner's findings?

24         THE WITNESS:  At any time?  I understand.  Yes.  I

25   was.
```

```
 1                THE COURT:  Okay.

 2                THE WITNESS:  I was aware.

 3                THE COURT:  Thank you.

 4                THE WITNESS:  It was public.  It was public.  Yes.

 5                THE COURT:  Thank you.

 6                You may proceed, Mr. Calderon.

 7                MR. CALDERON:  Thank you, Your Honor.

 8    BY MR. CALDERON:

 9    Q    And approximately when did you find out the findings

10    of that, of the medical examiner's report?

11    A    When the investigation finished probably, yes.

12    Q    Okay.  And approximately when was that?

13    A    I don't recall exactly.

14    Q    Okay.  You stated the time range of about seven months

15    later?

16    A    Yeah.  Yes.

17    Q    Okay.  Is that approximately when you --

18    A    Yeah.  Probably.

19    Q    Okay.  So would that have been after the procession,

20    after the events that we saw in the video?

21    A    Yes.

22    Q    And you stated that those findings were made public,

23    correct?

24    A    Afterwards, yes.

25    Q    Okay.
```

```
 1   A     After we found out what they had, yes.
 2   Q     Thank you.
 3         Now, you stated that in 1973, on or about September,
 4   that you lived in the same neighborhood as the president of
 5   Chile, President Allende?
 6   A     Oh, about 20 blocks away or 25, yeah.
 7   Q     Did you personally ever meet President Allende at that
 8   time?
 9   A     No.
10   Q     Do you know if your father, Victor Jara, ever met him
11   in person?
12   A     I think so, yes, but -- yeah.  It wasn't a friend of
13   his, no.
14   Q     And was he a supporter of President Allende?
15   A     Completely.
16   Q     Completely.  And he would perform, or would he perform
17   at concerts and rallies for President Allende?
18   A     He campaigned for his, for his, yeah, for his election
19   in 1970.
20   Q     Now, when you say the president's house, did he have a
21   residence aside from La Moneda that you referred to as the
22   White House of Chile?
23   A     He lived in a house, a normal, a normal house, you
24   know.  Presidents don't live in the same place as the house
25   of government in Chile.  He had a private place, you know.
```

```
1    Q    And that's my question.

2    A    Yes.

3    Q    He had a private residence?

4    A    Yes.  That is what was near our house.

5    Q    Okay.  And so La Moneda is basically the president's

6    office?

7    A    Yes.

8    Q    Okay.  Now, you said that your family had done

9    everything possible to bring the people responsible to

10   justice; is that right?

11   A    Yes.

12   Q    Did that include conducting your own investigations?

13   A    No.  It's legal and not conducting our own.  We've

14   worked with human rights lawyers for, since '78.  We've

15   presented several legal cases.  I don't know the technical,

16   legal names or concepts.

17   Q    You said --

18   A    Since '78.

19   Q    Since 1978.

20   A    And also we, yeah -- well, I don't know.  You're not

21   asking me that, so I'm not going to answer.  Yeah.

22   Q    And prior to 2010, after the results of the autopsy,

23   you had never heard the name Pedro Pablo Barrientos Nunez?

24   A    What?

25   Q    Prior to, I guess, on or about the year 2010, you had
```

```
 1   never heard the name Pedro Pablo Barrientos Nunez?

 2   A    Before 2010?

 3   Q    Correct.

 4   A    I didn't think at that moment we had access to all

 5   information.

 6   Q    Again, my question is, prior to 2010, you had never

 7   heard the name Pedro Pablo Barrientos Nunez; is that

 8   correct?

 9   A    I think he was in the legal expedient file.

10   Q    Yeah, prior --

11   A    That --

12   Q    Prior to 2010, my question is, were you aware of the

13   name of Pedro Pablo Barrientos Nunez prior to 2010?

14   A    Prior.  What are your markings?  Oh, 2010 because of

15   the --

16   Q    I'm just asking --

17   A    Yes.

18        No.

19   Q    Okay.  Thank you.

20        Now, do you think that Pinochet -- that Augusto

21   Pinochet is responsible for Victor Jara's death?

22   A    In a general way, yes.

23   Q    Okay.  And was General Pinochet tried?  Was he brought

24   to justice, in your mind?

25   A    He was declared interdicto.
```

```
 1   Q    So, again, in your mind was he brought to justice?

 2   A    There wasn't justice.

 3   Q    Now, Victor Jara, your father, was a great figure in

 4   Chile and to the people of Chile, correct?

 5   A    Yes.

 6   Q    Was that funeral, that procession that we saw earlier,

 7   was that televised?

 8   A    I don't know.  I didn't see it.  I was there.  I

 9   didn't see it on television.  I suppose so, but --

10   Q    I guess, did you see camera crews there, people

11   recording it?

12   A    From all over the world, yes.

13   Q    And is his death and the circumstances surrounding his

14   death still an open wound for the country and people of

15   Chile?

16   A    Yes.  As many other cases.

17   Q    And in the course of your investigations, did you find

18   that most of the higher-ranking officials at that time in

19   1973, that most of them were deceased?

20   A    In this particular case, in our case?

21   Q    Yes, ma'am.

22   A    Well, some of them died during the period, like

23   Manriquez, for instance, died during that period.

24   Fuschloger had died in an air crash accident.

25   Q    Okay.  That's impacted that a little bit.  With
```

```
 1   respect to Manriquez, was he the commander of the Estadio
 2   Chile?
 3   A    He was the person in charge of the administration of
 4   the stadium.
 5            MS. ROBERTS:  Objection.
 6            THE COURT:  Grounds?
 7            MS. ROBERTS:  This is her personal knowledge.
 8            THE COURT:  You can answer the question if you
 9   know, ma'am.
10            THE WITNESS:  To my knowledge, to my knowledge, he
11   was the person in charge of the administration of the
12   stadium, but that's all.
13   BY MR. CALDERON:
14   Q    And Rodrigo Rodriguez Fuschloger, is that the other
15   individual you mentioned?
16   A    You mentioned him, too, I think, yesterday.  He was in
17   charge of one of the sections, yeah.
18   Q    And you mentioned that name.  He was a high-ranking
19   official, to your knowledge?
20   A    Who?
21   Q    Rodrigo Rodriguez Fuschloger.
22   A    Yeah.  Him and oficial -- I don't remember his rank.
23            MR. CALDERON:  Nothing further.  Nothing further,
24   Your Honor.
25            THE COURT:  Any redirect, Miss Roberts?
```

1          MS. ROBERTS:  One moment, Your Honor.

2                  **REDIRECT EXAMINATION**

3   BY MS. ROBERTS:

4   Q    Miss Bunster, I think you just mentioned oficial.

5   What does that mean?

6   A    Lieutenant, must have been.  Somebody with high rank

7   who's not a conscript.  A soldier who is an oficial,

8   higher-rank military.

9          MS. ROBERTS:  Thank you.

10         Nothing further.

11         THE COURT:  Thank you, ma'am.  You can step down.

12         Call your next witness.

13         MS. ROBERTS:  We'd call Monica Gonzalez.

14         I'm going to request assistance of the court staff

15  so that I can use the ELMO.

16         THE COURT:  Is somebody retrieving Miss Gonzalez?

17         MS. ROBERTS:  She's here.

18         THE COURT:  Okay.  Yes, Miss Gonzalez, if you come

19  all the way forward, please, and be sworn.  Come all the

20  way down front, if you would, please.

21         MS. ROBERTS:  Miss Gonzalez does not speak

22  English.

23         THE COURT:  All right.  Why don't we have the

24  interpreter come forward, if we could, please.  And we'll

25  have him sworn first.

```
 1              Mr. Icaza, is that right?

 2              THE INTERPRETER:  That's correct, Your Honor.

 3              THE COURT:  Thank you for your assistance,

 4     Mr. Icaza.  Raise your hand to be sworn, please.

 5              (Interpreter sworn.)

 6              THE INTERPRETER:  I so swear.

 7              THE COURT:  All right.  Mr. Icaza, would you ask

 8     Miss Gonzalez to step forward, raise her right hand, and be

 9     sworn, please.

10              (Witness sworn.)

11              THE WITNESS:  Yes, I swear.

12              THE DEPUTY CLERK:  Please take the witness stand.

13              THE COURT:  Mr. Icaza, if you'll get a chair and

14     pull it up here next to the witness box.  And you can use

15     that microphone.  Or if you have a handheld microphone, you

16     can use that.  We need to hear you since you'll be

17     providing the translation.

18              THE INTERPRETER:  Yes, Your Honor.

19              THE COURT:  All right.  Mr. Icaza, would you ask

20     the witness, please, to state her name and spell her last

21     name, please.

22              THE WITNESS:  I am Monica Gonzalez, a Chilean and

23     a journalist.

24              G-O-N-Z-A-L-E-Z.

25              THE COURT:  All right.  Thank you.
```

```
 1              You may inquire, Miss Roberts.
```

 2                **DIRECT EXAMINATION ON VOIR DIRE**

 3    BY MS. ROBERTS:

 4    Q    Miss Gonzalez, I'd like to ask you about your

 5    background as a journalist.

 6         Could you please highlight for the jury your most

 7    relevant experiences, given your expected testimony today?

 8    A    (In English)  Good morning, Mrs. Roberts.

 9         (Through Interpreter) I've been a journalist for more

10    than 47 years.  And for the last 33, I have specialized in

11    investigative journalism.

12         Primarily because I am a Chilean, I investigated the

13    crimes of human rights committed by the Pinochet

14    dictatorship between 1973 and 1990.  And also the looting

15    that was performed upon the state held out by the military

16    authorities with the assistance of civilians.

17    Q    Have you received any awards for this work?

18    A    The most important one is the recognition by my

19    compatriots.  Yes.  I received the world award for freedom

20    of expression as awarded by the UNESCO, the most important

21    award that a journalist can aspire to in the world.

22         And this country has distinguished me with two of the

23    most important awards for foreign journalists.  The

24    University of Columbia with the Maria Moors Cabot Award and

25    the University of Harvard with the world yearly award.

```
1          And this Ibero-America as well, the Garcia Marquez

2     Foundation awarded me the Garcia Marquez Award.

3     Q     In the course of your career as a journalist

4     investigating human rights violations under the Pinochet

5     regime, what connection, if any, have you found between

6     this subject and the Chilean New Song movement?

7     A     There are five connections that I would like to list.

8     May I do so?

9     Q     Not yet.

10          What sources did you consult in developing this focus

11    of your work?

12    A     I have spent more than 30 years collecting

13    testimonials.  And there are thousands of them.

14          The important thing is the largest amount of truth

15    that I have collected is precisely from military personnel

16    who participated in the coup and who also participated

17    later on in the clandestine jails and in the clandestine

18    burials.

19          This allowed me to piece together, for example -- this

20    allowed me to piece together the preparation of the coup

21    d'etat when the military officers provided me with their

22    journals.

23    Q     Let me stop you there.

24          Have you previously been recognized as an expert by

25    any other courts?
```

```
 1   A     Yes.

 2   Q     With a French tribunal with Judge Lenois (phonetic);

 3   by an Argentine tribunal; and in Chile, by more than 50

 4   tribunals in more than 50 traditional processes.

 5         MS. ROBERTS:  Your Honor, we'd like to offer

 6   Miss Gonzalez as an expert on the political significance of

 7   the New Song movement, before, during, and after the

 8   coup d'etat and on the persecution and repression of the

 9   New Song movement by authorities of the coup d'etat,

10   including Victor Jara's murder and the conspiracy of

11   silence thereafter.

12         THE COURT:  Mr. Calderon, do you want to be heard

13   or voir dire the witness?

14         MR. CALDERON:  I'd like to voir dire the witness.

15         THE COURT:  All right.

16         MS. ROBERTS:  Your Honor, I just have a brief

17   objection, which is that we've already stipulated to this

18   expert witness.  The defendant has already agreed.

19         THE COURT:  Well, is that true, Mr. Calderon?

20         MR. CALDERON:  Your Honor, with respect to the

21   scope is the only thing that I want to inquire.

22         I've heard testimony regarding her expertise with

23   regard to the New Song movement.  However, there's other

24   aspects that I'm just trying to inquire about with regards

25   to the conspiracy.
```

 1              THE COURT:  What's the stipulation with respect to

 2   the expert?

 3              MR. CALDERON:  My understanding is her expertise

 4   on the New Song movement and its political impact.

 5              THE COURT:  Let me see the lawyers at sidebar for

 6   a minute.

 7              MS. ROBERTS:  Your Honor, we have a stipulation.

 8   One moment.

 9              Oh, I see.  Just to clarify, there's not an issue

10   as to the stipulation of the expert.  It's clearly to the

11   scope.

12              THE COURT:  Sidebar, please.

13              MS. ROBERTS:  I'm sorry.

14              (Discussion at sidebar on the record.)

15              THE COURT:  So I understand there was a

16   stipulation with the qualifications of the witness to

17   testify by you and Miss Roberts.

18              Is that correct or not?

19              MR. CALDERON:  No, Your Honor.

20              There was a stipulation.  She would be stipulated

21   to as an expert witness.  My understanding was that was

22   with regards to the political significance of the New Song

23   movement.  However, not with regards to the conspiracy of

24   selection or as an expert regarding the death and

25   persecution of Victor Jara.

```
 1              THE COURT:  Okay.
 2              MS. ROBERTS:  Your Honor, I have a copy of the
 3    report that we agreed on, which does include this --
 4    sorry -- which does include this level of detail.
 5              But we don't object to him inquiring as to her
 6    basis of knowledge on that.
 7              THE COURT:  Well, we don't need to inquire about
 8    it.  I'm going to allow the witness to testify in the
 9    opinion area about which there is no disagreement.
10              And that is the -- say it for me again?
11              MR. CALDERON:  The political significance of the
12    New Song movements throughout several periods.
13              MS. ROBERTS:  Before, during, and after the
14    coup d'etat.
15              THE COURT:  Political significance of the New Song
16    movement before and after the coup d'etat.
17              MR. CALDERON:  Before, during, and after the
18    coup d'etat.
19              THE COURT:  Okay.
20              MS. ROBERTS:  Your Honor, this limit on our direct
21    is -- I'm sorry.
22              But can we be heard on the issue of the second
23    topic?
24              THE COURT:  Sure.
25              (End of discussion at sidebar.)
```

1          THE COURT:  Let's take our jury out, if we could,

2   Mr. Carter.

3          You all can step back.

4          MS. ROBERTS:  Thank you.

5          THE COURT:  Sorry, ladies and gentlemen.  This is

6   going to take me a minute longer than I thought.  It will

7   be easier for us to do it if we can talk openly.

8          (Jury exited the courtroom at 11:07 a.m.)

9          THE COURT:  All right.  Let me give Mr. Calderon

10  an opportunity to explain for me and for the record what

11  his objection is to the broader categorization of the area

12  in which the plaintiff seeks to qualify this witness as an

13  expert under 702.

14         MR. CALDERON:  Thank you, Your Honor.

15         The areas that we have an objection to are with

16  regards to testifying as an expert regarding the conspiracy

17  of silence, also testifying with regards to the death and

18  persecution of Victor Jara.

19         Our objection is based on the fact that we haven't

20  heard anything regarding her qualifications as an

21  investigator.  I don't think she may refer to documents

22  that have not been provided.

23         And that's our concern, that there's mention of

24  officers' journals.  I don't believe those were ever

25  provided to us.

```
1              So that's my concern with regards to that.

2              THE COURT:  Okay.  You do have -- did this witness

3    provide an expert report pursuant to Rule 26?

4              MR. CALDERON:  Yes, Your Honor.

5              THE COURT:  And do either of you have a copy of

6    that available for me?

7              MS. ROBERTS:  Yes, Your Honor.

8              THE COURT:  Will you give that to Miss Flick, and

9    she'll pass it back to me.

10             MS. ROBERTS:  Yes.

11             THE COURT:  Thank you.

12             Now, Miss Roberts, I can read and listen at the

13   same time.  Why don't you tell me what testimony you expect

14   to elicit from this witness and why you think --

15             First, tell me three things:  What do you expect

16   to elicit?  Tell me why it's expert testimony, and then why

17   this witness is qualified to testify in that area.

18             MS. ROBERTS:  Absolutely, Your Honor.

19             We had a -- we gave an abridged qualification

20   because we thought we had a stipulation on all these areas.

21             Miss Gonzalez has had, has spent 47 years

22   reporting on the issues that are relevant to this case.

23             And in particular, she's going to speak to, as has

24   already been stipulated, the importance or the role of the

25   New Song movement before, during, and after the
```

1   coup d'etat.

2         She will further testify, as she states in her

3   report, that the attacks against Victor Jara were that he

4   was singled out because of his association with the New

5   Song movement and its association with the left.

6         And further, that there has been particular

7   motivation on the part of the military not to speak about

8   what happened because of the importance of Victor Jara with

9   the headlines.

10        THE COURT:  Okay.

11        MS. ROBERTS:  She refers to it in this report as

12  the legacy of impunity.  We were going to simplify it a

13  bit, for obvious reasons, in terms of presenting it to the

14  jury.

15        THE COURT:  I guess the question that I wanted to

16  get some clarity on is whether or not you intended to

17  elicit any testimony from this witness with respect to the

18  culpability of the defendant in the circumstances or events

19  that resulted in Mr. Jara's death.

20        MS. ROBERTS:  No, Your Honor.  This witness is

21  focused on the element of the discriminatory intent with

22  respect to torture.

23        THE COURT:  Okay.  And I understand that there's

24  no disagreement -- there's no objection from the defense

25  with respect to the political significance of the New Song

1    movement before, during, and after the coup d'etat.

2         So tell me, with respect to the remainder of the

3    testimony that was described by Miss Roberts, what is

4    objectionable and what are your grounds for objecting to

5    it?

6         MR. CALDERON:  Yes, Your Honor.  With regards to

7    the censorship --

8         THE COURT:  Come on up to the podium, please.

9         MR. CALDERON:  Thank you, Judge.

10        Our understanding was that the, I guess, this idea

11   of the censorship with regards to the music was what the

12   expert was going to testify, not about a code of silence

13   among soldiers.

14        I think that that would kind of bring into the

15   realm of what she referred to earlier as journals by the

16   officers to which she could extrapolate that information

17   which would be hearsay.

18        And I think it goes beyond the scope of what we

19   had envisioned this expert testifying to.  We thought this

20   was in regards to the cultural significance of the New Song

21   movement, persecution of singers within that movement by

22   the government, which is completely acceptable.  We had

23   stipulated as much.

24        However, once it goes beyond that, with regards to

25   the relationship among soldiers and their abilities to come

1    forward, I think that goes way beyond the scope.  And I

2    don't think this expert is qualified to testify with

3    regards to that.

4         THE COURT:  Okay.  Well, here's how the situation

5    appears to me.  This witness is principally a journalist,

6    although she's done extensive work in this area.  I think

7    she's been demonstrated to be qualified to offer opinion

8    testimony as to the general political climate before,

9    during, and after the coup d'etat as it relates to the New

10   Song movement.

11        I think she's qualified to testify with respect to

12   what the New Song movement was, what its political

13   implications were and membership in it.

14        I think she's qualified to testify based on what

15   I've heard about the, to the extent that Mr. Jara was a

16   participant in the New Song movement and the political

17   ramifications of his association with that movement.

18        I want to make sure, though, and the reason I

19   asked Miss Roberts the question is, as a journalist, not as

20   an investigative officer or someone charged with

21   responsibility to conduct criminal or quasi-judicial

22   investigations, that she's not being offered nor would she

23   be permitted to offer opinions with respect to the

24   culpability of any individual or individuals in terms of

25   the actual extrajudicial torture and killing that's at

1    issue in this case.

2          So that's -- I want to make sure that we're clear

3    about that, Miss Roberts.

4          MS. ROBERTS:  Your Honor, I'd like to -- well, two

5    things.

6          First, I'd like to direct the Court's attention to

7    the final paragraph of the report which lists out the

8    conclusions.  This is a report the defendant has had for

9    months.  It was disclosed properly in discovery.  These are

10   the conclusions to which she intends to -- that we intend

11   to present testimony.

12         I would offer to qualify her on her qualifications

13   to testify about the conspiracy of silence related to this

14   murder.  I have not done so only because I thought we had a

15   stipulation.

16         THE COURT:  Okay.

17         MS. ROBERTS:  I'm sorry.  I think you asked a

18   question I didn't answer.  I apologize.  I must have missed

19   it.

20         THE COURT:  Here's the only part of what I see and

21   hear that troubles me in terms of at least the predicate

22   that's before me at this moment.

23         And that is the testimony with respect to what

24   happened to Victor Jara and to an unknown number of Chilean

25   and foreign citizens who were imprisoned in the Chile

```
 1   Stadium.
 2          That, that portion of her testimony, I need to
 3   have some additional predicate for in terms of how it is
 4   that she comes to be prepared to testify in the opinion
 5   realm in that area.
 6          So I'm going to let you do that by way of proffer.
 7          And then I'll give Mr. Calderon an opportunity if
 8   he wants to follow up on that.  And then I think I'll be
 9   fully informed.  And I can make a ruling.
10          MS. ROBERTS:  Thank you, Your Honor.
11          THE COURT:  You're welcome.
12          MS. ROBERTS:  Shall I proceed?
13          THE COURT:  Yes.
14   BY MS. ROBERTS:
15   Q    Miss Gonzalez, Miss Gonzalez, I'm going to ask you
16   some questions before the jury comes back.
17   A    Yes.
18   Q    You've spoken or you've written in your report about
19   conspiracy of silence relating to the events that took
20   place at Chile Stadium from September 11th to 15th,
21   1973.
22   A    Yes.
23   Q    Can you explain the basis of what sources you
24   consulted in order to arrive at those conclusions?
25   A    Chile recovered its democracy in 1990.  And as of that
```

1    moment and very slowly, justice began to appear for the

2    crimes that were committed during the dictatorship.

3         Just a moment ago, I had stated that I had

4    participated as an expert witness in more than 50 processes

5    in Chile and also in Argentina and in France.

6         In my experience, uninterrupted in this area, never

7    did I find a conspiracy of silence to ensure the impunity

8    of what was done such as that surrounding the events at

9    Chile Stadium and Victor Jara primarily.

10        That is directly connected to his important role in

11   Chile and around the world as an important icon of a

12   musical movement.

13   Q    Let me stop you there for a moment.  How many

14   interviews did you perform in researching this topic?

15   A    More than 1500, including judges.

16   Q    And who else did you interview besides judges?

17   A    Soldiers, generals, colonels, and also survivors from

18   different concentration camps.

19   Q    What documents did you refer to or look at?

20   A    Official documents concerning the assignments of

21   military units, military orders, but also photographs.

22        For example, you could see the fire of the burning of

23   the books and records of the new Chilean song.

24   Q    So you mentioned consulting officers' notebooks.

25   Could you describe those, those notebooks in more detail?

1          THE COURT:  Can I interrupt you for a minute,

2     Miss Roberts?

3          MS. ROBERTS:  Yes.

4          THE COURT:  Because you're getting a little too

5     far into the weeds of the testimony for what I'm interested

6     in.

7          Let me try to do a better job of clarifying what

8     I'm concerned about.

9          When I look at this witness' expert report, in

10    paragraph number 5 on the last page, 20, she says she

11    intends to testify to "what happened to Victor Jara."

12         And so my concern is if your intent is to offer

13    this witness as an expert in investigative journalism to

14    describe the political climate, to describe the New Song

15    movement, to describe the ramifications of Victor Jara's

16    association with the New Song movement, to describe the

17    likely recriminations or adverse consequences of his

18    association with the New Song movement as a result of the

19    coup d'etat, all of that is perfectly appropriate in light

20    of her qualifications as you've described in this report.

21         If you intend to ask this witness if she has an

22    opinion as to whether Mr. Barrientos Nunez either

23    personally or someone under his direction or control

24    committed the extrajudicial murder, detention, or torture

25    or Mr. Jara, that I'm not going to permit.

```
 1              MS. ROBERTS:  That was absolutely never our

 2    intention, Your Honor.

 3              THE COURT:  Okay.  Great.

 4              MS. ROBERTS:  We will not ask her about the

 5    defendant at all.

 6              THE COURT:  Okay.  What troubles me is what

 7    happened to Victor Jara is a little bit loose.

 8              MS. ROBERTS:  Understand.

 9              THE COURT:  I don't know whether that was

10    Mr. Calderon's concern, but that was my concern.

11              MS. ROBERTS:  Yes, Your Honor.  I think we're

12    talking about the, what happened to Victor Jara has been,

13    for the most part, stipulated in this case and is not at

14    issue in this case.

15              Who did it is obviously a different question.  And

16    maybe that gives you some comfort that that wasn't the

17    intention.

18              THE COURT:  It does.

19              MS. ROBERTS:  But I understand your point that

20    it's a loose phrase.

21              THE COURT:  It does.

22              Mr. Calderon, with the Court's clarification, do

23    you have additional concerns that you want to address?

24              MR. CALDERON:  Yes, Your Honor.  Also with regards

25    to the conspiracy of silence among the officers -- and I
```

1    think Miss Roberts was starting to inquire regarding

2    that -- again, we've already heard there were about 1500

3    people interviewed, officers in the stadium --

4         THE COURT:  Here's what we're going to do on that.

5    I'm going to let you raise objections during the course of

6    the testimony with respect to portions of it if you think

7    that they are outside either your stipulation or outside

8    the scope of this witness' capacity to testify as an

9    expert.  I'll let you raise those.

10        But I -- conspiracy of silence is too nebulous a

11   term for me to make some -- I'm not informed enough about

12   her testimony to be able to rule on that.

13        So I'm going to give you an opportunity to raise

14   those objections as they arise during the course of her

15   testimony.

16        MR. CALDERON:  And additionally --

17        THE COURT:  I can't hear you.  I'm sorry.

18        MR. CALDERON:  Additionally, Judge, if we could

19   voir dire with respect to whether she's ever been -- I

20   understand she's been qualified with respect to the New

21   Song movement.

22        Has she ever been qualified with regards to the

23   other areas that Miss Roberts is trying to inquire about?

24   That was what I wanted to voir dire her on initially.

25        THE COURT:  Okay.  Do you want to ask her that

```
 1   question, Miss Roberts?

 2            MS. ROBERTS:  I'm not sure I understand which

 3   point he's seeking clarification on.  Silence?

 4            THE COURT:  You can ask the question,

 5   Mr. Calderon.

 6            MR. CALDERON:  Thank you, Your Honor.  Would you

 7   like me to approach?

 8            THE COURT:  Yes, please.

 9               CROSS EXAMINATION ON VOIR DIRE

10   BY MR. CALDERON:

11   Q    Miss Gonzalez, have you ever been qualified as an

12   expert witness to testify specifically in the area of the

13   conspiracy of silence that's been described in the

14   courtroom today?

15   A    Precisely as an expert witness on the conspiracy of

16   silence, which is to say for the guarantee of impunity, no.

17   Q    Have you ever been qualified as an expert to testify

18   with regards to the facts or circumstances surrounding the

19   death of Victor Jara?

20   A    No.

21            MR. CALDERON:  Nothing further, Your Honor.

22            THE COURT:  All right.

23            MS. ROBERTS:  Your Honor, may I follow-up?

24            THE COURT:  Yes.

25              REDIRECT EXAMINATION ON VOIR DIRE
```

```
 1   BY MS. ROBERTS:

 2   Q    Miss Gonzalez, what does the word --

 3   A    I apologize.  I apologize.

 4        There is but one thing.  I have testified at trials

 5   that have to do with the Chile Stadium in Chile.  Not about

 6   Victor Jara, but yes in trials about Chile Stadium.

 7   Q    The defendant's attorney asked you about a conspiracy

 8   of silence.  What does this phrase mean to you?

 9   A    The conspiracy of silence for the illegal association

10   means the organization put together by those who have

11   committed crimes or who are accomplices to said crimes or

12   whose silence is bought in order to obstruct justice and

13   prevent how certain persons were killed and who the

14   officers were.

15   Q    And have you published any books on this topic?

16        THE COURT:  Let me stop you there for a minute,

17   Miss Roberts.  I may have missed it, but I've gone

18   carefully, as relatively carefully in the time permitted,

19   through the witness' report and I don't find the phrase

20   conspiracy of silence in the report.

21        Here's my concern.  That's an editorial comment.

22   It's a term -- it's unnecessary to the witness' testimony.

23   And the witness can testify as to the facts and

24   circumstances that lead her to believe that there was a

25   concerted effort to cooperate between these individuals to
```

```
 1   repress the truth, to keep justice from being, you know,
 2   pursued.
 3           But to express it in the editorial way that there
 4   was a conspiracy of silence among the participants is a
 5   bridge too far, in my opinion.
 6           So I'm going to sustain Mr. Calderon's objection
 7   to the utilization of the phrase conspiracy of silence.
 8           But I'm not going to constrain you in your
 9   examination of the witness as to whether or not, based on
10   her investigative work, she -- I don't know whether she is
11   of this opinion; but it seems that she is, from her report,
12   that there was a concerted effort among these individuals
13   to thwart efforts to uncover the events that actually
14   occurred and to keep those facts from coming to light.
15           So, but do it in a way that doesn't reach --
16   doesn't use editorial phrases like conspiracies of silence
17   or there may be others that I'm not thinking of.  But that
18   one at least I find to be -- I think the objection is
19   appropriate to that.
20           So what I intend to do is I'm going to -- I intend
21   to tell the jury that the witness is going to be permitted
22   to offer opinion testimony in the area of the political
23   significance of the New Song movement before, during, and
24   after the coup d'etat, the circumstances surrounding the
25   collection of individuals in the Chilean stadium, and the
```

```
 1   political climate and the consequences for participating in

 2   the New Song movement, and leave it at that.

 3          And then you can -- you can inquire consistent

 4   with anything that's in the witness' Rule 26 motion.  And

 5   Mr. Calderon will make appropriate objections along the way

 6   as he sees fit.

 7          MS. ROBERTS:  That's fine, Your Honor.

 8          THE COURT:  Great.  Thank you.

 9          Let's bring our jury back, please, Mr. Carter.

10          Here's your report back.

11          It's also my practice to give the jurors an

12   abbreviated version of the instruction on expert witnesses.

13   In other words, she's going to be permitted to offer expert

14   testimony.  Consider it as you would any other witness.

15   You're not obligated to accept the opinion.  You should

16   weigh them as you would any other testimony.

17          MS. ROBERTS:  Your Honor --

18          COURT SECURITY OFFICER:  All rise for the jury.

19          (Jury entered the courtroom at 11:29 a.m.)

20          THE COURT:  All right.  Ladies and gentlemen,

21   thank you for your patience with us.

22          This -- the rules of federal procedure permit

23   certain witnesses who have demonstrated to have expertise,

24   either by training or experience in one area or another, to

25   offer opinion testimony which ordinarily would not be
```

1    permitted.

2         This witness has been qualified and will be

3    permitted to testify with respect to opinions in the area

4    of the political significance of the New Song movement in

5    Chile, both before, during, and after the coup d'etat.

6         She's also going to be permitted to testify to the

7    consequences or the political ramifications to an

8    individual such as Victor Jara or others who may have been

9    associated with the New Song movement during the time of

10   the coup d'etat in the early 1970s.

11        As with other witnesses, just because someone has

12   been permitted to offer opinion testimony doesn't mean that

13   you need to accept their testimony any differently than you

14   would anyone else's.

15        You still apply all of the criteria for

16   believability that you would apply to any other witness.

17   You should give it whatever weight that you think is

18   warranted under the circumstances.

19        But our rules do permit witnesses to offer opinion

20   testimony when they've been properly qualified.  This

21   witness has been properly qualified, is going to be

22   permitted to testify by way of opinion in the areas that I

23   just described for you.

24        You may inquire, Miss Roberts.

25        MS. ROBERTS:  Thank you, Your Honor.

1       **DIRECT EXAMINATION**

2   BY MS. ROBERTS:

3   Q    Miss Gonzalez, do you have a good understanding based

4   on our discussion with the judge and the other attorneys as

5   to the phrase or phrases that you should not be including

6   in your testimony, what's been excluded?

7   A    I believe so.

8   Q    All right.  Miss Gonzalez, could you please describe

9   the principal conclusions that you expect to testify about

10  today?

11  A    I have five.

12       The first one is about what is the new Chilean song to

13  which Victor Jara belonged.

14       The second is what is the role that Victor Jara played

15  in that movement.

16       The third is based on that role why one of the most

17  important figures such as Victor Jara in the new Chilean

18  song movement, why did he receive the brutal treatment that

19  he received at the location known as the Chile Stadium?

20       The fourth is Victor Jara was not the only one to

21  suffer that treatment of repression and criminality.

22       One of the most incredible points is that the

23  dictatorship tried to turn the new Chilean song into one of

24  the first disappeared entities in Chile.  That was the

25  importance.

1        The fifth is in what manner in comparison to other

2   trials it became more difficult to arrive at the truth of

3   the Chile Stadium.

4        Do you wish me to explain one by one?

5   Q    Well, just a moment.

6        Miss Gonzalez, what was the New Song movement?

7   A    In Chile, we had a Chilean song that existed and had

8   forever.  But in the '60s there was an emergence of a

9   musical movement that is very closely connected to the

10  demands of students, and especially of peasants.

11       And this is because there is a right wing government

12  that begins the first agrarian reform and the dolling out

13  of land, which is followed by a center left government

14  which deepens the agrarian reform.

15       And I will tell you that in Chile, in 1964, there was

16  a great majority of peasants who received no salary.  They

17  would receive a biscuit, a piece of bread once a day.

18       They had the right to cultivate, and the foreman of

19  the field would bring them clothes and produce, used

20  clothes and produce.  There was very -- there was very much

21  misery, squalor.

22       And Victor Jara is a man from that world, from the

23  peasant world.

24       In the 1960s this movement emerges that demands for

25  peasant salaries, working days of a certain amount of

1    hours, to which student demands are attached for better

2    education quality, and more workers' rights within

3    factories.

4         The interesting part is that this movement is done

5    through music.  Maybe I have never seen anything happier

6    and more constructive, and I think I know -- you'll have to

7    remember that the end of the '60s, '69, when we have the

8    first Chilean song festival.

9         In Latin America there is dysfunction.  There are

10   dictatorial governments.  And the leftist forces have

11   chosen the road of armed struggle in order to try and

12   recover democracy.

13        Not in my country, a country that is a marvel, that

14   music brings to life.  And that soaks Chile from the north

15   to the south.  It's happy.  It has no weapons.  It doesn't

16   have a sense of death.

17        Because it summarizes, maybe like none other,

18   something that very few of us have had the privilege of

19   living in conditions of great squalor.  To be capable of

20   transforming the face of squalor of a country without the

21   need of killing and without running the risk of dying.

22   It's marvelous.

23        Victor Jara was -- Victor Jara sings to the till.  You

24   have to till the land with happiness.  No one can take my

25   happiness away as I till the land.

```
 1        It is a movement of construction.  You would see

 2   Victor with a sack over his shoulder, unloading flour at

 3   volunteer work, as you would see him building a house in

 4   one of the more marginalized shanty towns where houses

 5   are -- where houses are made merely of fabric and

 6   cardboard.

 7   Q    Let me interrupt you there for a moment.

 8   A    Yes, please.  I apologize.

 9   Q    You mentioned Victor Jara.  Who were some of the other

10   artists and groups most associated with the New Song

11   movement?

12   A    Quilapayun, which is a band.  Inti-Illimani.  Rolando

13   Alarcon.

14        Something important.  The Cuncumen group is directed

15   by Victor Jara because it's dance.  It dances.

16        At this, a very talented man from the classical music

17   world composes.  He comes from the major university school

18   to compose the music with the singers, primarily Victor

19   Jara.

20        And there you have the Santa Maria de Iquique cantata,

21   one of the most beautiful compositions that pays homage to

22   the silence of men and women and so many children who were

23   massacred in Iquique.

24        Victor Jara was an actor.  He studied theater.

25            MR. CALDERON:  Objection, Your Honor.  Objection.
```

```
1   Narrative.
2          MS. ROBERTS:  Let me interrupt you and ask another
3   question.
4          THE COURT:  I'll sustain the objection.
5          Let's get back to Q-and-A.
6          Mr. Icaza, if you would explain to Miss Gonzalez
7   that we need to try to avoid long narrative answers.
8   Listen to the question, answer it as succinctly as she can,
9   and then Miss Roberts will have a new question.
10         You may inquire.
11  BY MS. ROBERTS:
12  Q    How often in those days would you hear songs from the
13  New Song movement played on the radio?
14  A    In the street, on the bus.  Not on the subway.  We
15  still didn't have one.
16  Q    What was Victor Jara's role in the New Song movement?
17  A    That's what I was going to say.  Because since he was
18  an actor, and also dancer, and a peasant, he didn't need to
19  don a poncho in order to pretended to be a peasant.  He was
20  one.
21       And that broad smile gave life to the happiness.  It
22  wasn't a lament.  It wasn't submission.  It was dignity.
23       And that's how -- that's how Victor Jara became by
24  singing that happiness of the construction of life and
25  became the most important face of that movement.
```

```
1    Q     Are you familiar with the song Manifiesto?

2    A     Yes.

3    Q     What can you tell us about that song?

4    A     It's almost a summary of what I said -- I have just

5    said.  I don't sing just to sing, nor because I have a good

6    voice.  I sing because the guitar gives it sense and reason

7    to life, to work, to solidarity, to live in a community and

8    to get out.

9          That is the most important, to get out of squalor

10   through work and dignity.

11             MS. ROBERTS:  Your Honor, we'd like to play -- I'd

12   like to play Victor Jara's Manifiesto, which was previously

13   admitted into evidence as Joint Exhibit 54, and

14   simultaneously show the jury the English translation.

15             THE COURT:  Any objection to the English

16   translation portion of that, Mr. Calderon?

17             MR. CALDERON:  No, Your Honor.

18             THE COURT:  All right.  You may proceed.

19             MS. ROBERTS:  We will need the assistance of the

20   court staff to switch from the ELMO to the computer screen.

21             (Playing audio exhibit.)

22             MS. ROBERTS:  If I could ask the Court's

23   assistance one more time to switch back to the ELMO.  We

24   have the outline in front of us.

25             Thank you.
```

1   BY MS. ROBERTS:

2   Q   Miss Gonzalez, before we move on to your next

3   conclusion, is there anything else you'd like to add about

4   Victor Jara's role in the Chilean New Song movement?

5   A   I believe I didn't talk about his role as a composer.

6   That also turned him into an outstanding figure.

7       It is impossible to separate the political movement

8   and the development of that political movement from the

9   development of this musical movement to the point where the

10   lyrics are better than many speeches and more valuable.

11   Q   So turning now to the third subject, it is a matter of

12   public record and what happened to Victor Jara is not

13   really contested.

14       But can you tell us very, very briefly what happened

15   to Victor at the stadium?

16   A   When he arrives at the stadium with the prisoners,

17   those who had been taken prisoners at the --

18       MR. CALDERON:  Your Honor, I'm going to object as

19   to personal knowledge.

20       THE COURT:  Objection is overruled in light of the

21   witness' qualification to testify or offer opinions.  So --

22       THE WITNESS:  Victor Jara, and it is of public

23   knowledge today, that at the Chile Stadium he was

24   immediately recognized by the officers that were in command

25   there.

1           He was brutally beaten and segregated or singled

2    out to continue his torture.  Why?  Because he was an icon.

3    To humiliate him.  To defeat him.

4           It would be to defeat -- it would be the same as

5    defeating a people that saw in him their representative.

6    BY MS. ROBERTS:

7    Q    Let me interrupt you and ask my next question.

8         Why, in your expert opinion, was Victor Jara singled

9    out for that kind of treatment?

10   A    Because of what he represented.  He represented the

11   courage of a peasant's son who sings of dignity.  And he

12   sings of rebelliousness against any violence.

13        If we believe that the popular nucleus on that

14   movement was always respectful of the Constitution and the

15   laws in Chile, Victor Jara was just that.

16        And in light of the thousands of prisoners, it was an

17   example they showed to say, Look at the fortune.  Look at

18   the destiny that awaits you if you do not submit as a man.

19   Q    What was the moral and social significance of Victor

20   Jara's death?

21   A    It's incredible, right?  Music sometimes plays such an

22   important role.  Those who assassinated him thought that

23   they were asphyxiating or suffocating his voice, his hope

24   for justice.  And his music, to turn into a disappeared

25   entity.

1        And then it had to be played in silence and in

2    darkness.  It was a ritual.  Families would come together,

3    would gather.  And on these very dark nights, you would

4    hear his voice.  It would be like an illumination.  It was

5    like, No, no, you will not silence us.

6        I'm absolutely certain that Victor Jara -- and it is

7    horrible what I'm going to say -- dead, he became an

8    unstoppable instrument in order to achieve such a paradox.

9    Q    Why do you say it was a paradox?

10   A    Because those who killed him wanted to silence him

11   forever, such as liberty with a new order, under which all

12   Chilean rights were suppressed; peasant rights were

13   suppressed.  Freedom of the press.  Individual freedom.

14   Not even churches were respected.

15       And look, his song gave strength to maintain, to

16   resist and not through arms.

17       But to resist through building solidarity that would

18   be capable of doing away with death and with indignity.

19       With his song -- and I can remember as if it were

20   today.  I saw nuns, I saw priests chain themselves together

21   and embrace each other in front of a Santiago cathedral,

22   singing a laborer's prayer, demanding justice for the dead.

23       It was a symbol.  He was a symbol.

24   Q    Let me stop you there.

25       You mentioned earlier that Victor wasn't alone, that

```
 1   other elements of the Chilean New Song movement were

 2   repressed or censored.

 3        How did you reach this conclusion?

 4   A    Well, because the military announcements were public

 5   where they were being searched for.  They would raid houses

 6   like crazy people searching for, looking for the -- looking

 7   for the chemists and the autochthonous or indigenous

 8   musical instruments.

 9        It was almost a revolutionary act to own one, just as

10   it was to have his long-playing records.

11        And those that were spared because they were on tour

12   outside the country.

13   Q    Let me stop you just for a moment.  You mentioned that

14   they were searching for autochthonous or traditional

15   authentic instruments.

16        Why would those be the object of a search?

17   A    Because what was not wanted is that us, to the tune of

18   those instruments that have provided us dignity, culture,

19   and ownership of what is ours, for us to, once again,

20   demand our rights.  The music was indivisively connected to

21   that.

22        And it's impressive to see what dictatorships search

23   for:  Darkness.  Cries.  Submission.  Terror.  Happiness is

24   an anecdote.  And so is music.

25        And what can I say about dignity?
```

```
1   Q    What other methods did the new government use to

2   repress the New Song movement?

3   A    The burning of the musical records.  They took Ricardo

4   Garcia as a prisoner.  One of the most important men of the

5   New Chilean Song, who created a record label in order to

6   record the records to disseminate them.  And he was also

7   one of the founders of that movement.

8        It was prohibited.  His music was never heard on the

9   radio.  It was only clandestine.  They transformed it into

10  clandestine music.

11  Q    You mentioned that people would listen to his music in

12  a clandestine fashion or a hidden fashion.  Why hidden?

13  A    Because there is no dictatorship in the world that can

14  do away with dignity and squash it completely.  Because

15  when one voice --

16            MR. CALDERON:  Your Honor, I'm going to object.

17  This is irrelevant commentary, outside of the scope of her

18  opinion.

19            THE COURT:  Objection is overruled.

20            If it's what I'm thinking of, I don't think it's

21  outside of her opinion.

22            So objection is overruled.

23            THE WITNESS:  May I continue?

24            THE COURT:  Yes.

25            THE WITNESS:  (In English)  Thank you.
```

```
1              THE INTERPRETER:  Gracias.

2              THE WITNESS:  I want to say something I forgot.

3   Victor had --

4              MR. CALDERON:  Objection, Your Honor.  This is

5   outside the scope.

6   BY MS. ROBERTS:

7   Q    May I remind the witness to listen to my questions and

8   respond only to those questions.

9   A    (Speaking.)

10             MR. CALDERON:  Objection, Your Honor.

11  Nonresponsive.

12             THE COURT:  Ladies and gentlemen, why don't we

13  take our lunch break.  This is probably as good a time as

14  any.  And I'll see if we can get us back on track when you

15  all come back.

16             Remember that this is not the time to discuss the

17  case amongst yourselves or with anyone else.

18             It's about five minutes after 12:00.  So if I

19  could ask you to be back and ready to go at 1:20, and we'll

20  resume with the testimony of Miss Gonzalez.

21             (Jury exited the courtroom at 12:03 p.m.)

22             THE COURT:  Mr. Icaza, if you would remind

23  Miss Gonzalez that she needs to listen to Miss Roberts'

24  question and respond directly to the question.  Stay away

25  from narratives and stay away from adding additional
```

 1   information that's not included within the question.

 2          It makes it very difficult if you're involved in a

 3   long narrative that includes information that is outside of

 4   the bounds or beyond the scope of the question for the

 5   lawyers to react to that.  And it's fundamentally unfair.

 6          So I need to ask you to make sure you answer the

 7   question as directly and as succinctly as you can.

 8          And Miss Roberts, I'm quite confident, will ask

 9   you all the questions that you need to be asked in order to

10   tell us everything that's on your mind as it relates to

11   this case.

12          Understood?

13          THE WITNESS:  Yes.

14          THE COURT:  Thank you.  We'll be in recess until

15   1:20.

16          MS. ROBERTS:  Thank you, Your Honor.

17          (Luncheon recess at 12:04 p.m. to 1:32 p.m.)

18          THE COURT:  We're back on the record in Jara

19   versus Barrientos Nunez.

20          I'm sorry to be late.  We're having, the Court

21   notes that counsel are present, the parties are present.

22   We're having our share of unanticipated wrinkles in this

23   case.

24          Mr. Anderson, as you may recall, is our UCF

25   student.  And Mr. Anderson, I've been in touch with his

1    professors.  I haven't been able to speak to them, but I've

2    been in touch with them electronically.

3              One of his professors has been unwilling to

4    accommodate his absence.  He indicated that he'll either

5    have to take an incomplete or withdraw from the program.  I

6    can fix that problem.

7              But my difficulty is by the time I get to Dr. Hitt

8    and get the problem rectified, Mr. Anderson is going to

9    be -- he only has two more classes, and he's starting

10   graduate school.

11             If he takes an incomplete, of course, he'll not

12   be -- it's not that he won't graduate.  He'll withdraw.

13             So he very much wants to serve, recognizes it's

14   his obligation to serve.  But I'm concerned that he would

15   not be in the best frame of mind to give the case his

16   attention.  We obviously can't afford many more, any more

17   juror casualties.

18             But I am inclined to excuse Mr. Anderson and let

19   him get on to his class.  And I will take it up with

20   Dr. Hitt, the president of the university, when I can.

21             But by the time I do that, you know, Mr. Anderson

22   will, you know, he'll be left with whatever options are

23   available to him.

24             I don't know that even Dr. Hitt can force one of

25   the professors to give, to make an accommodation for the

```
 1    fellow in the time that we have, you know, to get the

 2    accommodation sorted out.

 3           So that's what I intend to do.  And I'll give you

 4    all both an opportunity to make a comment if you want to

 5    and to object, if you'd like to.

 6           But that's what I intend to do.

 7           Mr. Dellinger?

 8           MR. DELLINGER:  You intend to excuse the juror?

 9           THE COURT:  I do intend to excuse him.

10           MR. DELLINGER:  We've discussed it with our team.

11    The last thing we want is a juror who doesn't want to be

12    here.

13           THE COURT:  He wants to be here.

14           MR. DELLINGER:  Or that there's going to be

15    complications.

16           THE COURT:  I want to make sure the parties

17    understand that unlike Mr. Ferris this morning,

18    Mr. Anderson very much wants to discharge his civic

19    responsibility to serve as a juror.

20           But under the circumstances, I don't think he's

21    going to be able to do it with the consequences, the

22    potential consequences hanging over his head.

23           So that's the reason I'm going to excuse him.

24           MR. DELLINGER:  I hope you will have that

25    conversation with Dr. Hitt.
```

```
 1              THE COURT:  You can rest assured I will.

 2              MR. DELLINGER:  Thank you, Your Honor.

 3              THE COURT:  Mr. Calderon?

 4              MR. CALDERON:  Judge, we leave it in the Court's

 5    discretion.

 6              THE COURT:  Okay.  Let's bring our entire panel

 7    back in.  Mr. Carter.

 8              I'm going to excuse Mr. Anderson.  But there's no

 9    reason to shuffle people in and out.  I'll let you escort

10    Mr. Anderson out, and we can spare you for a few minutes

11    while you do that.

12              Thank you.

13              The jurors have handed me another question totally

14    unrelated to what we just discussed, indicating that they'd

15    like for the lawyers to refrain from objecting when there's

16    an interpreter until after the interpreter has translated

17    the question.

18              So I hadn't actually been mindful of that.  But it

19    makes some sense from their perspective.  They want to hear

20    the question translated before the objection.

21              So just for the lawyers, let's make sure we put

22    some space in there.

23              And for the witness as well, Miss Gonzalez.  For

24    that reason, I need to make sure that you wait until the

25    question is asked completely before you begin to answer it.
```

```
 1            And we'll have to go a little bit more
 2   deliberately than we would ordinarily because of the
 3   translator being in between the question, answer, and the
 4   objection.
 5            So the jurors are just concerned that they -- they
 6   want to make sure that they're not missing things because
 7   we're talking on top of one another.
 8            Could you make that a Court's exhibit, please.
 9            Thank you, Mr. Carter.
10            (Jury entered the courtroom at 1:39 p.m.)
11            THE COURT:  Where's Mr. Anderson?
12            THE DEPUTY CLERK:  He was walking him downstairs.
13   Did you want him in here first?
14            THE COURT:  Yes.
15            (Juror Anderson entered the courtroom
16             at 1:39 p.m.)
17            THE COURT:  Mr. Anderson, just have a seat right
18   there on the end.  I didn't mean to shove you in and out.
19   I know you need to get on the road.  I want to make sure --
20            First of all, let the record reflect our jury is
21   back in the box.
22            And, ladies and gentlemen, we've had our share of
23   unexpected developments here.  Mr. Anderson, as you may
24   recall from his voir dire examination, is in school as is
25   Miss Platt.
```

1           And I did communicate with his professors.

2    Unfortunately, I've been unable to speak directly to one of

3    his professors.  She can only, I guess, communicate by

4    email.  But I do have a phone number for her, but she's in

5    her class now.

6           Mr. Anderson is graduating and needs this credit

7    to graduate.  And, of course, he's starting graduate

8    school.

9           And his professor has given him a couple of

10   options which are unacceptable, either of which would

11   result in his not completing the class, either withdrawing

12   from the class or taking an incomplete.

13          That's not -- as I explained to Mr. Anderson when

14   we chatted briefly out of your presence, that's something

15   that I can fix.  But by the time I fix it, it will probably

16   be -- it will put Mr. Anderson in a difficult spot.

17          And I'm concerned about whether -- he's expressed

18   a willingness obviously and an interest in serving and

19   doing his civic duty, but I'm concerned that the

20   distraction of worrying about whether he's going to be able

21   to finish his school or not is going to be difficult for

22   him to deal with.

23          So I've made the decision.  I've communicated it

24   to the lawyers, and they have no objection.  We're going to

25   excuse Mr. Anderson with the thanks of the Court.

```
 1              I hate to lose him because we're down to -- we're
 2    down to six.  And we cannot suffer any more casualties.
 3              But I trust you all understand that this is not a
 4    decision that I've made lightly.  I've tried to reach this
 5    professor.  She's in class at the moment.  I am going to
 6    take it up -- and I don't mean this in a threatening way.
 7    She may not fully understand what's transpiring here.
 8              I'm going to give her the benefit of the doubt
 9    that she doesn't understand what's transpiring here.  But I
10    will take it up with the president of the university after
11    our case is over so that we don't run into this kind of
12    difficulty again.
13              But that won't help Mr. Anderson in the short run.
14              So I hope you understand that I'm not giving
15    Mr. Anderson special privileges that are not available for
16    the rest of you.
17              I'm making an accommodation for him because I'm
18    concerned, going back to my threshold obligation to make
19    sure the parties have a fair trial, that trying to
20    deliberate, listen to the evidence while wondering if he's
21    going to be able to successfully graduate is too much to
22    ask of anyone.
23              So, Mr. Anderson, I'm going to excuse you with the
24    thanks of the Court.  Hopefully, you can make a little bit
25    of the end of your class.
```

```
 1              As I said, I'll follow-up through the necessary
 2    channels.  There's nothing for you to do.  You don't need
 3    to get involved.  You don't have a dog in this fight.
 4    There's no point in getting on the wrong side of your
 5    professor.  Go take your classes.  Do well on your exam.
 6    Graduate.  And I'll take it from here.  Okay?
 7              JUROR:  Okay.
 8              THE COURT:  All right.  Thank you, sir.
 9              Mr. Carter will show you out.
10              JUROR:  My apologies, Your Honor.
11              THE COURT:  No problem.  Bad communication on my
12    part.
13              All right.  Are we ready to proceed?
14              MS. ROBERTS:  Yes, Your Honor.
15              THE COURT:  Thank you.  You may inquire.
16              Also, ladies and gentlemen, I also received your
17    other note.  I've spoken to the lawyers about it.
18    Hopefully, we've got that situation under control.
19              JURY:  Thank you, Your Honor.
20              MS. ROBERTS:  If I could ask the assistance of the
21    court staff in putting the ELMO back up on the screen.
22              Thank you.
23    BY MS. ROBERTS:
24    Q    Good afternoon, Miss Gonzalez.
25    A    Good afternoon, Mrs. Roberts.
```

```
 1   Q    Before the break, you had mentioned that people were
 2   listening to Victor Jara's music in secret or hidden.
 3        What were people afraid of?  What would happen if
 4   someone was caught listening to Victor's music?
 5   A    It was indiscriminate.  Such are dictatorships.
 6        It could be a young group surprised singing outside a
 7   house in a shanty town in Santiago whose scalp was taken
 8   from them using a knife known as a Corvo, a military knife
 9   that is used for warfare.  And they were killed.  These
10   were young boys between 15 and 17 years of age.
11        Or maybe some days in jail.
12        It was indiscriminate.  And as everybody knew, it was
13   prohibited.  And there was much violence.
14   Q    I want to turn to your last conclusion that you
15   mentioned before the break, that it was difficult to find
16   the truth about responsibility in this case.
17        What did you base that opinion on?
18   A    Chile Stadium is the first concentration camp that we
19   have.
20            MR. CALDERON:  Objection, Your Honor.  This is
21   prejudicial.  It's inflaming the passions.
22            THE COURT:  Help me understand your objection,
23   Mr. Calderon.
24            The question was -- I'm looking at the question.
25            "I want to turn to your conclusion that you
```

1   mentioned before the break that it was difficult to find

2   the truth about responsibility in this case.  What did you

3   base that opinion on?"

4           That's the question.  What's your objection to

5   that question?

6           MR. CALDERON:  My objection was to the response.

7           First, it's nonresponsive, but it's prejudicial

8   and seeking to inflame the passions of the jury.

9           THE COURT:  Well, the only thing that she, the

10  only thing -- she didn't get out an answer, at least that I

11  see recorded.

12          Let me see the lawyers at sidebar just for a

13  second.

14          (Discussion at sidebar on the record.)

15          THE COURT:  I want to try to figure out a

16  practical way to sort through this problem because the

17  jurors have expressed a concern about it, before we get to

18  the substance of your objection, which I will.

19          But the jurors have expressed some unhappiness, I

20  guess, with the interjection of objections during the

21  course --

22          Of course, Mr. Calderon has a right to make

23  objections, and he's obligated to do that if he thinks it's

24  appropriate.

25          So I want to make sure he's doing that in a way

 1    that's not being seen by the jury as prejudicial to his

 2    case.  So I'm hoping for suggestions in terms of the way

 3    this testimony is coming in.

 4           But part of the problem is that your witness has

 5    testified obviously extensively.  She knows what she wants

 6    to say.  And she's off to the races, you know, before

 7    Mr. Calderon can know exactly where she's going to end up.

 8           I don't say that judgmentally.  I just say that's

 9    a fact.  And like a lot of experts, you know.

10           So I'm going to remind her again to try to be

11    responsive specifically to your question.

12           But, Miss Roberts, I want you to try to exercise a

13    little bit more control over her in terms of, ask her

14    discrete questions that are easily encapsulating the

15    response.

16           And try to do the best you can -- I understand you

17    can't testify for her -- the best you can to keep her from

18    going into narratives.

19           So that's sort of the -- that's an editorial

20    comment that I think will help us a little bit later on.

21           Now, let me hear about the specifics of our

22    objection.  Where do you think she's going to with this?

23    What's your concern about it?

24           MR. CALDERON:  Well, Judge, I let her get to the

25    point where she said that the -- Chile Stadium was the

1    first concentration camp, and I think that that language is

2    clearly prejudicial.  It evokes emotions of, you know, Nazi

3    Germany.  And I think that that is a dangerous thing

4    because that's not what we're talking about here.

5           And furthermore, it's nonresponsive to the

6    question.

7           The question that was asked was with regards to

8    finding the truth.  So if she can just stick to answering

9    that question and not give prose about her feelings about

10   the stadium or what it was, or give inappropriate

11   descriptions of it, that would be appreciated.

12          THE COURT:  Okay.  We can do this one of two ways,

13   I think, that's fair.  And I think we can do this a couple

14   of ways.

15          I can either -- I can give you the opportunity to

16   go back to the podium and ask her to not use, don't say --

17   just tell us what happened.  Don't use editorial comments.

18          Or I can tell her.

19          MR. BECKETT:  Can I be heard on this term

20   concentration camp?  We used this very deliberately.  And

21   we've looked up the dictionary definition of concentration

22   camp and it just means a group of concentrated detainees,

23   which is exactly what she's saying.

24          So it's a completely objective neutral use of the

25   term.  It doesn't have any connotations, nor is she really

1    using it for any connotations in that way.

2         THE COURT:  I don't dispute the bona fides of what

3    you just told me, Mr. Beckett.  But I will say in the

4    common parlance, concentration camp has connotations

5    associated with it that transcend your definition.

6         I think Mr. Calderon also has concerns about that.

7    That is not inappropriate.

8         So I'm going to allow -- I'm not going to say you

9    can't use the term concentration camp, but I'm going to

10   require you to explain what you're talking about rather

11   than just use it generically.

12        In other words, if you're talking about -- when

13   you say so, what I would suggest -- I'll do it or you can

14   do it -- is to ask the witness, when you use the term

15   concentration camp, are you talking simply about a

16   concentrated location of detainees?  You don't mean, you

17   know, this business of Nazi Germany.

18        I think it is a fair worry.

19        MS. ROBERTS:  Sure, I can do that.  I can do that.

20        THE COURT:  Okay.  I don't know if that will make

21   you happy, Mr. Calderon, but that's where we're going to

22   end up.

23        (End of discussion at sidebar.)

24        THE COURT:  Ladies and gentlemen, we had a

25   discussion at sidebar about a portion of the witness' last

```
 1   response that Miss Roberts is going to ask some additional

 2   questions and get some clarity to about what the

 3   terminology meant.

 4          So I apologize for the interruption.  I think it

 5   will save us some time going forward.  I'll let

 6   Miss Roberts get to that.

 7          You may inquire.

 8   BY MS. ROBERTS:

 9   Q    Miss Gonzalez, you used the phrase concentration camp

10   to describe Chile Stadium just a moment ago.

11        Could you please explain what that phrase means in the

12   Chilean context?

13   A    It would be the international context, I would say.

14          MR. CALDERON:  Objection.

15          THE WITNESS:  If you allow, what is a prisoners'

16   camp, a war prisoners' camp.  A camp for prisoners who are

17   officially recognized in which -- by the authorities of the

18   military junta where there were tortures, assassinations,

19   and in some of those there were, in fact, bodies burned.

20          That is included and contained within the truth

21   that has been uncovered by tribunals, both in Chile, as in

22   Italy, France, and Argentina.

23          THE COURT:  You've answered the question, ma'am.

24          MS. ROBERTS:  Let me stop you there.

25          THE COURT:  Thank you.
```

```
 1   BY MS. ROBERTS:

 2   Q     Let me stop you there.

 3         Has truth -- let me see.  Sorry.

 4         There were many locations where people were detained

 5   during and after the coup.  Has it been difficult to

 6   discover the truth of what happened in those other places?

 7   A     That is an incredible story of how truth was arrived

 8   at step by step of the known prisoners' camp, official

 9   prisoners' camp, as well as secret jails and secret camps.

10              MR. CALDERON:  Object, Your Honor.  Unresponsive.

11              THE COURT:  Objection sustained.

12              Miss Gonzalez, I want to remind you again to just

13   answer the question that you're asked.

14              Okay?

15              THE WITNESS:  (Speaking.)

16              THE COURT:  There's no question pending right now.

17   There's no question you can answer.

18   BY MS. ROBERTS:

19   Q     How has the truth come to light, in general, in Chile

20   at a high level?

21   A     Through the conjunction of confluence of two facts.

22   Those who have dared -- what the survivors have dared to

23   say from the prisoners' camps.  And fundamentally from the

24   truth from those military personnel whose consciences has

25   made them reveal their crimes.
```

```
1    Q     And has arriving at the truth with respect to what
2    happened at Chile Stadium been any different?
3    A     Completely different.
4    Q     How so?
5    A     At the Chile Stadium, the first war prisoners' camp,
6    it is the last one left where it has been difficult to
7    know, and up to this date it is not known, how many people
8    died inside Chile Stadium.
9    Q     And why has this situation been different?
10   A     Because how the military authorities even under
11   democracy have obstructed justice, have manipulated the
12   information to prevent knowledge of, for example, which
13   military officer was in charge of the camp, who tortured,
14   and who was assassinated, including foreign nationals.
15   Q     What is a conscript?
16   A     A conscript is the last link of the chain of command
17   of the Army.  In general, they are young peasants or from
18   shanty towns of scarce resources.
19         Those are the ones who do their military service,
20   conscripts.  Because Chileans are absolved or they are
21   allowed not to do the service as a result or as a function
22   of their studies.
23   Q     Let me stop you there.  Were there conscripts at Chile
24   Stadium?
25   A     Yes.
```

```
1    Q    And how have conscripts been seen by society in Chile
2    who were involved in the coup?
3    A    The conscripts were the major invisible parties in all
4    of the violations of human rights.  Because if we're
5    talking democracy, they were mistreated, and badly
6    mistreated, and they were forced to do most of the dirty
7    work.
8              MR. CALDERON:  Your Honor, I'm going to object.  I
9    think we've gotten outside the scope of her expertise.
10             THE COURT:  Objection is overruled.
11             THE WITNESS:  Once the coup d'etat took place,
12   those conscripts were the ones who ended up somewhat
13   paralyzed in light of the violence that took place.  And,
14   for example, a few days had to transpire before the
15   conscripts were ordered to torture and to assassinate.
16   BY MS. ROBERTS:
17   Q    Let me stop you there.
18        What reason, if any, have conscripts had -- or those
19   former conscripts had to stay silent?
20   A    Terror.  Terror that they feel even today.
21        These are very modest people.  They saw incredible
22   atrocities, had to dig clandestine graves in order to bury
23   people who had been, well, even deformed.
24        They were threatened if they said anything about what
25   they had seen and who had performed these atrocities.  They
```

```
 1    would pay with their lives.

 2    Q    In your opinion -- in your opinion, are conscripts

 3    today still threatened?

 4            MR. CALDERON:  Your Honor, I'm going to renew my

 5    objection as to the scope.

 6            THE COURT:  What is the relevance as to what

 7    conscripts feel today in terms of their response?  What's

 8    the relevance of that to the circumstances in 1973?

 9            MS. ROBERTS:  Your Honor, it goes to the

10    continuing difficulty in finding the truth about what

11    happened.

12            THE COURT:  Today?

13            MS. ROBERTS:  Or until when.  I can revise my

14    question.

15            THE COURT:  Well, as it is, the question is overly

16    broad and includes time periods that may not be relevant.

17    So I think the objection is well taken.

18            I'll give you an opportunity to recast the

19    question.

20    BY MS. ROBERTS:

21    Q    I'm going to ask you a different question, related.

22         You mentioned that the conscripts experienced terror.

23         How long do you think that lasted?

24    A    For many of them up until today.  And I have proof of

25    that.
```

```
 1   Q    Miss Gonzalez, how important a figure is Victor Jara
 2   in Chile today?
 3            THE INTERPRETER:  Could the attorney please repeat
 4   the question for the interpreter?
 5            MS. ROBERTS:  Yes.
 6   BY MS. ROBERTS:
 7   Q    How important a figure is Victor Jara in Chile today?
 8   A    I'll give you an example -- private --
 9            MR. CALDERON:  Objection, Your Honor.
10            THE COURT:  I'm sorry?
11            MR. CALDERON:  Objection, Your Honor.  Again,
12   unresponsive.
13            THE COURT:  If you can answer the question,
14   Miss Gonzalez, without using examples.  Just answer the
15   question.
16            THE WITNESS:  Without using an example?
17            THE COURT:  Yes.
18            THE WITNESS:  Yes or a no?
19            THE COURT:  It doesn't have to be a yes or no.
20   But the question is, how important is Victor Jara?
21            THE WITNESS:  He continues to be the most
22   important icon of the musical movement in Chile, but he
23   brings to life something even greater.
24            He brings to life the sense that justice, the
25   impunity that darkens the life of a country, and that
```

```
 1    provokes and encourages those that would commit

 2    assassinations.

 3              Victor Jara is the last link of a long chain of

 4    impunity and there is a desire that that impunity be

 5    reverted to be able to build a stable respected by one and

 6    all.  He deserves it.  Chile deserves it.

 7              THE COURT:  Mr. Carter, would you take our jury

 8    out for a moment.

 9              I apologize, ladies and gentlemen.

10              (Jury exited the courtroom at 2:03 p.m.)

11              THE COURT:  Mr. Icaza, I need your help, please.

12              Miss Gonzalez, I understand that there's a lot you

13    want to say and that this is an important platform for you,

14    that you are an advocate and that you believe strongly in

15    the events about which you are testifying.

16              But this is not a place for advocacy.  This is a

17    place for you to answer questions.  The lawyers will do the

18    advocating.

19              So I've asked you several times to please answer

20    the questions directly and not give long narrative answers

21    that are unresponsive to portions of the question.

22              If you continue to ignore my advice, I'm going to

23    have to curtail your testimony.  I don't want to do that

24    because I don't think it would be fair.

25              But if you don't follow my instructions, I am
```

```
 1   going to do that.

 2          Are we understanding one another?

 3          THE WITNESS:  I understand.

 4          THE COURT:  And, Miss Roberts, again, I want you

 5   to exercise control as best you can.  Ask direct questions

 6   that call for a discrete response.  Do not elicit long

 7   narrative, theoretical answers from this witness.

 8          Because she does not have the ability -- I'm not

 9   impugning her motives.  I don't think she's being

10   contentious.  But I do believe that she is unable in some

11   areas to constrain herself.

12          And I'm going to call on you to give me some help.

13   And if you cannot, I'm going to stop it because I don't

14   think it's fair.

15          MS. ROBERTS:  Understood, Your Honor.

16          THE COURT:  All right.

17          MR. CALDERON:  Your Honor, we would just request

18   -- I'm sorry.

19          We would just request the curative instruction to

20   strike the last responses with regards to Chile needing

21   justice, we needing justice.  I think it's inappropriate.

22   I don't think the jury should consider it.

23          THE COURT:  I'm going to explain to the jury why I

24   sent them out and what we're trying to get accomplished.

25          And I will strike that portion of the witness'
```

1    response.

2            MR. CALDERON:  Thank you, Your Honor.

3            THE COURT:  Let's bring our jury back, please,

4    Mr. Carter.

5            (Jury entered the courtroom at 2:07 p.m.)

6            THE COURT:  Thank you, ladies and gentlemen.  I

7    appreciate your patience.

8            Because of the language issues, I wanted to ask

9    you all to leave so that I could have a more fulsome

10   conversation with the witness to try to reiterate my

11   request that we stay on task and that we have questions and

12   then answers that are responsive to the question and not

13   long narrative responses that have a tendency to go beyond

14   the question and include additional information.

15           So it's not an effort to keep anything from you.

16   I just thought I could do that better perhaps with you

17   outside of the room.

18           I am going to instruct you to disregard the

19   witness' response to the last question, that portion that

20   dealt with what Chile needs and the pursuits of Chile or

21   the interests of the nation of Chile.

22           And we'll get back to the matters at hand.

23           You may inquire, Miss Roberts.

24   BY MS. ROBERTS:

25   Q    Miss Gonzalez, is Chile Stadium today known by the

```
 1   same name as it was in 1973?

 2   A     No.

 3   Q     What's it called today?

 4   A     Victor Jara Stadium.

 5   Q     And why was that name changed?

 6   A     Because it is considered that he was the most

 7   important victim within that stadium.

 8              MS. ROBERTS:  Thank you.

 9              I have no further questions.

10              THE COURT:  Thank you, ma'am.

11              Cross-examination?

12              MR. CALDERON:  No cross, Your Honor.

13              THE COURT:  All right.  Thank you.

14              Thank you very much, Miss Gonzalez.  You can step

15   down.  If you were under subpoena, you're released from it.

16   You can go about your business.  Thank you.

17              Call your next witness.

18              THE WITNESS:  Thank you.

19              THE COURT:  Thank you, Mr. Icaza.

20              THE INTERPRETER:  You're welcome, Your Honor.

21              MR. BECKETT:  Your Honor, our next witness will be

22   presented through videotape.  So if the Court could just

23   allow us a few minutes to connect the computer, we'll get

24   ready to show that.

25              THE COURT:  Sure.  While you're doing that, I'll
```

```
 1    explain what that means to the jury.

 2            Ladies and gentlemen, the next witness, who's name

 3    I'll get from counsel in just a moment, is going to

 4    testify -- we still sometimes call it by videotaped

 5    deposition.  We haven't used videotape in a long time, but

 6    we're hard to retrain.  So that's what we call it

 7    sometimes.

 8            It's going to be presented to you in digital

 9    fashion.  It will be displayed on your screen.

10            This witness was made available during what we

11    call the discovery part of the case.  And the lawyers were

12    present.  There was a court reporter there.  The witness

13    was placed under oath and examined just as he or she would

14    have been were he or she here on the witness stand.

15            And so you should consider the testimony just as

16    you would if the witness were here testifying in front of

17    you in person.

18            What's the name of the witness?  And what was the

19    date of the deposition, Mr. Beckett?

20            MR. BECKETT:  The witness' name is Jose Santiago

21    Navarrete.  And the date of the deposition was

22    November 21st, 2015.

23            THE COURT:  All right.  Thank you.

24            Ladies and gentlemen, to the extent that -- one of

25    the other things that happens sometimes during these
```

```
 1   recorded depositions, that the lawyers may raise an
 2   objection here or there during the course of the testimony.
 3          Sometimes those get edited out, and sometimes they
 4   don't.  If you happen to hear that, you should just not pay
 5   any attention to it.
 6          Those have all been taken care of.  Okay.
 7          MR. BECKETT:  Judge, just for the record, all of
 8   the objections have been taken out.
 9          And, of course, our colleagues have agreed to
10   that.
11          THE COURT:  I appreciate your good efforts in that
12   respect.  It's oftentimes not possible to get that done.
13          So it may happen -- if I forget to mention it and
14   we have other videotaped depositions, if you happen to hear
15   one of the lawyers raise an objection, just know that's all
16   been taken care of.
17          MR. BECKETT:  Judge, with your permission, I'd
18   also like to read some stipulations into the record just
19   before the playing of this deposition.
20          THE COURT:  Sure.
21          Ladies and gentlemen, this will give me an
22   opportunity to tell you about the role of stipulations in
23   the case.
24          Obviously everything in every lawsuit is not
25   contested by the parties.  Some things are not disputed.
```

```
 1    Oftentimes the lawyers, in an effort to save your time, the

 2    Court's time, and to streamline the proceedings, will enter

 3    into stipulations.  And the lawyers in this case have

 4    stipulated to certain facts.

 5            Mr. Beckett is going to tell you at least what

 6    some of those are now.  There may be others later.  But you

 7    should accept those stipulations just as if the -- you

 8    should accept those stipulations as proven facts.

 9            Understood?

10            JURY:  Yes.

11            THE COURT:  Okay.  You may proceed, Mr. Beckett.

12            MR. BECKETT:  Thank you, Your Honor.

13            I'm going to read joint stipulation -- I'll just

14    wait for a minute.

15            I know what that feels like.

16            I'm just going to read joint stipulation number

17    33:  A Luger is a type of pistol.

18            And in joint stipulation 34:  In September 1973,

19    defendant's side weapon was a Luger.

20            Thank you, Judge.

21            THE COURT:  Thank you.

22            MR. BECKETT:  At this point we can play the

23    videotape if we're ready.

24            (Playing video deposition of

25             Jose Santiago Navarrete.)
```

```
1              MR. BECKETT:  Judge, that's the end of the
2    deposition.
3              THE COURT:  All right.  Thank you.
4              Call your next witness.
5              MR. BECKETT:  Judge, the parties have a
6    stipulation that in lieu of the testimony of Dr. Etxeberria
7    in connection with the forensic report that is, has been
8    admitted into evidence as Joint Exhibit 15, that the
9    plaintiffs' counsel can read selected portions of that
10   report into the record.  It would take maybe ten minutes.
11             And Miss Belsher will do that at this time if it
12   pleases the Court.
13             THE COURT:  All right.  Which exhibit number is
14   this?
15             MR. BECKETT:  This is JTX-15.
16             And there are also a number of exhibits to this
17   report.  And she will also be displaying two of those
18   exhibits.  They are photographs, JTX-4 and JTX-6.
19             THE COURT:  All right.  Thank you, sir.
20             All right.  Ladies and gentlemen, some portions of
21   documents that were previously admitted into evidence will
22   be read for you.  You'll have the entire document at the
23   time that you retire to deliberate as well as all of the
24   attachments.
25             But in an effort to, again, try to streamline the
```

```
 1    proceedings, lawyers are going to publish what we call --
 2    we should say read but we still say publish portions of
 3    those to you.
 4              You may proceed.
 5              MS. BELSHER:  Background:  On 4 June 2009 --
 6              THE COURT:  Make sure you're careful to read
 7    slowly so the court reporter can keep up with you, please.
 8              MS. BELSHER:  Yes, Your Honor.
 9              THE COURT:  Thank you.
10              MS. BELSHER:  On 4 June 2009, members of the Legal
11    Medical Service's special unit for human rights proceeded
12    to exhume the human remains belonging to Victor Lidio Jara
13    Martinez at the General Cemetery of Santiago in compliance
14    with that agreed upon by Special Inspecting Judge Juan
15    Eduardo Fuentes Belmar in Case Number 108.496-MG followed
16    by the crime of homicide.
17              The remains were transferred to the special unit
18    for human rights of the Legal Medical Service of Santiago
19    where the relevant judicial investigations have been
20    performed.
21              Objective:  To interpret the existing injuries
22    of the skeletal remains in relation to Protocol Number
23    26-09 UE in order to establish the cause of death and the
24    circumstances that led to it.
25              The autopsy report that was carried out on the
```

```
1    corpse on 18 September 1973 documents the existence of
2    multiple gunshot wounds as described below.
3            Cranial region, two entrance wounds in the right
4    parietal.
5            Thoracic region, 16 entrance wounds and 12 exit
6    wounds of different sizes.
7            Abdominal region, six entrance wounds and four
8    exit wounds.
9            Right upper extremity, two transfixing wounds.
10           Lower extremities, 18 entrance wounds and 4 exit
11   wounds.
12           THE COURT:  Looks like 14 exit wounds.
13           MS. BELSHER:  Oh, sorry.  My apologies.  14 exit
14   wounds.
15           1973 autopsy report.
16           Head, two.
17           Trunk, sixteen and twelve.
18           Right upper extremity, two and two.
19           Abdomen, six and four.
20           Lower extremities, eighteen plus forty-four.  Oh,
21   sorry.  Fourteen.  My apologies.
22           Gunshot wounds described in the 1973 autopsy
23   report.  Entrance wounds in red and exit wounds in blue.
24           Head:  Gunshot wound with a loss of a rounded
25   shape substance with a diameter larger than 20 millimeters
```

1   and with radial fractures that run alongside the vault and

2   the base of the skull located in the middle occipital

3   region.

4          This injury displays an internal bezel of the

5   occipital bone, which is characteristic of the passage or

6   penetration of a firearm projectile that causes the

7   avulsion of a small external fragment with the

8   morphological features of a keyhole or a key or lock hole

9   wound -- in parentheses, Di Maio 1999 -- that determines a

10  back-to-front trajectory with a slight slope on the right

11  side and likely indicates the possibility that the shot had

12  been taken at a close range.

13         Gunshot wound with a loss of an irregular shaped

14  substance larger than 25 millimeters wide with an external

15  bezel and radial fractures in the right frontal parietal

16  suture that can be interpreted as a result of an impact

17  injury, with a gunshot exit wound.

18         In fact, this injury corresponds to the entrance

19  wound in the occipital region that, after crossing the

20  cranial cavity with a trajectory from the back to the

21  front, bottom to top, and left to right, it impacted this

22  area causing a bone injury without the projectile leaving

23  the skull that has been located in its interior.

24         Entry wound from a firearm projectile in the

25  middle occipital region.  To the right, the external bezel

1    by avulsion of the bone from an oblique shot probably taken

2    at close range.  Typical keyhole wound morphology.

3              Oh, Joint Exhibit 16.

4              And this is Joint Exhibit 4.

5              Expert report of Etxeberria.

6              Legal medical discussion:  As has been noted,

7    almost all of the injuries described on the skeletal

8    remains can be justified as a result of the direct impact

9    and/or the travel of firearm projectiles traversing the

10   body.

11             In fact, the autopsy report from 1973 describes a

12   total of 42 entrance wounds and a total of 32 exit wounds

13   at the cutaneous level.

14             The injury to the skull would have triggered an

15   immediate loss of consciousness and immediate death as a

16   result of the destruction of a major organ such as the

17   brain that would have injured the right hemisphere with

18   significant intracranial hemorrhage.  By itself, this

19   injury is sufficient to justify the death.

20             Conclusions:  The immediate cause of death is due

21   to traumatic hemorrhagic shock in the context of a legal

22   medical etiology, violent homicide.

23             Among the most likely, it is probable that the

24   victim received the first shot to the back of the skull and

25   then, already on the ground, multiple shots that reached

```
 1   him in many areas of the body.

 2             That's all, Your Honor.

 3             THE COURT:  All right.  Thank you.

 4             All right.  Ladies and gentlemen, let's take our

 5   afternoon break.  It's 3:00, a little bit after.  Let's

 6   come back at 3:15, and we'll proceed with the next witness

 7   for the plaintiff.

 8             (Jury exited the courtroom at 3:01 p.m.)

 9             THE COURT:  Lawyers need me for anything before we

10   break?

11             MR. BECKETT:  No, sir.

12             MR. CALDERON:  No, Your Honor.

13             THE COURT:  Recess until 3:15.

14             (Recess at 3:01 p.m. to 3:19 p.m.)

15             THE COURT:  Back on the record in Jara versus

16   Barrientos Nunez, 6:13-civil-1426.

17             Counsel and parties are present.

18             Are you ready to proceed, Mr. Beckett?

19             MR. BECKETT:  Yes, Judge.  We're going to show

20   another videotape.

21             THE COURT:  Okay.

22             MR. BECKETT:  Before we do that, just so Your

23   Honor is aware, I'd like to read some other stipulations.

24             THE COURT:  Okay.  Let's bring our jury back,

25   please, Mr. Carter.
```

```
 1              Who's this witness, Mr. Beckett?

 2              MR. BECKETT:  Your Honor, this witness is Nelso

 3      Artemio Barraza Morales.

 4              THE COURT:  Okay.  And the date of the deposition?

 5              MR. BECKETT:  This is a video deposition.

 6              THE COURT:  What date?

 7              MR. BECKETT:  I'm sorry.  It's November 17, 2015.

 8              THE COURT:  Thank you.

 9              (Jury entered the courtroom at 3:21 p.m.)

10              THE COURT:  All right.  Welcome back, ladies and

11      gentlemen.

12              Miss Platt, housekeeping message.  I spoke to your

13      professor.  All good.

14              JUROR:  Both of the professors?

15              THE COURT:  Well, starts with a D.

16              JUROR:  Yes.  Thank you.

17              THE COURT:  Yes.  So I've only spoken to one, but

18      I'm sure I'll hear from the other one.  But so far so good.

19              JUROR:  Thank you.

20              THE COURT:  Ladies and gentlemen, the lawyers have

21      another stipulation that Mr. Beckett is going to read to

22      you.

23              And then it's going to be followed up with another

24      digital or video deposition of an individual by the name of

25      Nelso Artemio Barraza Morales taken November the 17th,
```

1   2015.

2          Mr. Beckett, you may proceed.

3          MR. BECKETT:  Thank you, Judge.

4          I'm going to read stipulation 17:  In September of

5   1973, Nelso Artemio Barraza Morales was a corporal in the

6   first section of the Second Company.

7          I'm going to now read you stipulations one through

8   ten:

9          One, in September 1973, defendant was a soldier in

10  the Chilean Army.

11         Two, in September 1973, defendant was a lieutenant

12  at the Tejas Verdes School of Engineers.

13         Three, in September 1973, the Tejas Verdes School

14  of Engineers was based in San Antonio, Chile.

15         Four, in 1973, the Tejas Verdes regiment contained

16  a battalion known as the Bronze Battalion.

17         Five, the Bronze Battalion was commanded by Major

18  Alejandro Rodriguez Faine.

19         Six, within the Bronze Battalion were three combat

20  companies.

21         Seven, one of these combat companies was second

22  command -- sorry -- Second Combat Company of the Tejas

23  Verdes School of Engineers, Second Company.

24         Eight, the Second Company was commanded by Captain

25  Luis German Montero Valenzuela.

1              Nine, after Captain Luis German Montero

2    Valenzuela, Lieutenant Pedro Pablo Barrientos Nunez,

3    defendant, was the most senior officer in the Second

4    Company.

5              Ten, as the second highest officer in the Second

6    Company, defendant could issue orders to all individuals in

7    the Second Company, say for Captain Luis German Montero

8    Valenzuela.

9              I'll now read you joint stipulations 28 through

10   31:

11             In September 19 -- I'm sorry -- 28, in September

12   1973, defendant could issue orders to all sergeants of the

13   Second Company.

14             29, in September 1973, defendant could issue

15   orders to all corporals of the Second Company.

16             30, in September 1973, defendant could issue

17   orders to all conscripts of the Second Company.

18             31, in September 1973, defendant could issue

19   orders to all officers in the Second Combat Company, except

20   for Captain Luis German Montero.

21             Thank you, Judge.

22             THE COURT:  Thank you, Mr. Beckett.

23             MR. BECKETT:  We'll now play the videotape

24   deposition of Nelso Artemio Barraza Morales.

25             This is someone who was at Chile Stadium as

```
 1    opposed to the video you heard earlier which was the --
 2            MR. CALDERON:  Object to the characterization of
 3    testimony.
 4            THE COURT:  That's not appropriate, Mr. Beckett.
 5            Ladies and gentlemen, the information as to who
 6    this is, where they are or what they were doing will come
 7    from the witness' testimony.
 8            I have mentioned to you many times what the
 9    lawyers say is not evidence, just what you hear from the
10    witness.
11            MR. BECKETT:  I'm sorry, Your Honor.  I didn't
12    mean it as evidence.  Just as a segue.
13            THE COURT:  Understood.
14            (Playing video deposition of
15             Nelso Artemio Barraza Morales.)
16            MR. BECKETT:  Your Honor, we pause the videotape.
17            I wonder at this time if I could publish to the
18    jury a map that's already in evidence as Joint Exhibit 64
19    that we've already made reference to to help the jury
20    understand the points of reference to which the deponent is
21    referring.
22            THE COURT:  Did the deponent reference this
23    exhibit in his testimony?
24            MR. BECKETT:  Not this exhibit.  No, sir.
25            THE COURT:  Okay.  Mr. Calderon?
```

1           MR. CALDERON:  Your Honor, we'd object just

2     because of the fact that this was not an exhibit that was

3     part of the deposition.

4           THE COURT:  I think that's -- I'm going to sustain

5     the objection, Mr. Beckett.

6           You can let it play.

7           And if you can use another witness to help with

8     the map, I think that's fine.  But unless this witness was

9     shown the map and used it in the course of his testimony, I

10    don't think it's appropriate to interrupt his testimony

11    with it.

12          MR. BECKETT:  Understood, Judge.

13          I would just note there's no dispute about the

14    accuracy of this map or the locations that are referenced

15    in the map.  It's stipulated.

16          THE COURT:  Understood.

17          MR. BECKETT:  Okay.  Thanks, Judge.

18          (Playing video deposition of

19           Nelso Artemio Barraza Morales.)

20          MR. BECKETT:  Judge, there is a document referred

21    to in this deposition.  It is marked in evidence as Joint

22    Exhibit 59.

23          And with the Court's permission, we'd like to

24    project it on the ELMO.  We'll have to switch between

25    devices.  It's just a diagram to orient the jury to what

```
 1   the deponent is talking about.
 2           THE COURT:  Okay.  You can put that on the ELMO
 3   and we'll switch over there.  And then once the jury has
 4   had the opportunity to look at it, then we'll go back to
 5   the deposition.
 6           MR. BECKETT:  And I should note that the document
 7   has other pages showing other levels.  So perhaps I'll show
 8   those as well.  I'm not sure what they refer to, but just
 9   in the interest of completeness.
10           And I'll go back, just to the top.
11           It helps if I turn it around.
12           Are you seeing it the right way?
13           JURY:  No.
14           THE COURT:  All right, ladies and gentlemen, I'll
15   remind you also you're going to have these exhibits with
16   you when you retire to deliberate.
17           Obviously, look at it as long as you care to.  If
18   you feel like you've gotten familiar enough with it, we'll
19   go back to the testimony.
20           Let me know and we'll switch back over to the
21   witness.
22           Yes?
23           JURY:  Yes.
24           THE COURT:  Thank you.
25           (Playing video deposition of
```

```
 1                Nelso Artemio Barraza Morales.)
 2           MR. BECKETT:  Judge?
 3           THE COURT:  Yes.
 4           MR. BECKETT:  There is an exhibit referred to, a
 5   marked-up version of an exhibit that we displayed to the
 6   jury earlier.
 7           It was -- supposedly there was an image of it at
 8   the end of the videotape that we are having trouble
 9   finding.  But we have a PDF version of that document, with
10   the letters indicated by the deponent.  He's referred to
11   them and indicated where it shows up on the diagram.
12           So I just wondered if there would be any objection
13   to us displaying that?
14           THE COURT:  Okay.  I have none.  I don't know if
15   Mr. Calderon has an objection or not.
16           MR. CALDERON:  No, Your Honor.
17           THE COURT:  That will be fine.  Do you want to
18   use -- do it the same way we did before and put it on the
19   ELMO and then go back and forth?
20           MR. BECKETT:  Unfortunately, in this case we have
21   a digital copy, so we'll have to switch computers.  It will
22   just take a second.
23           THE COURT:  Okay.
24           Can you make it a little bit bigger?  It's hard to
25   see.
```

```
 1              MR. BECKETT:  If we make it bigger, we lose all of
 2   the letters.  But perhaps we'll just scroll down, starting
 3   at the top.
 4              With no objection, we'll return to the videotape.
 5              THE COURT:  All right.
 6              (Playing video deposition of
 7               Nelso Artemio Barraza Morales.)
 8              MR. BECKETT:  Judge, without objection, I'd like
 9   to go back to the diagram I had shown before.  Because at
10   that time, when we showed you earlier, the letter D hadn't
11   been put on it.
12              THE COURT:  That will be fine.
13              MR. BECKETT:  Thank you.
14              (Playing video deposition of
15               Nelso Artemio Barraza Morales.)
16              MR. BECKETT:  Judge, we had a bit of a garbled
17   tape.  There was an editing problem apparently.  We'd just
18   like to read from the transcript to make clear what the
19   question and answer were.  We didn't hear the answer to
20   that question.
21              THE COURT:  How much longer?
22              MR. BECKETT:  This tape is maybe two minutes more
23   and this will take thirty seconds.
24              THE COURT:  Okay.  Make sure Mr. Calderon has the
25   page and line you're reading from.
```

1          MR. BECKETT:  Yes.  This is on the transcript of

2     the deposition, page 74, line 15.

3          And the question is:  What officers would you say

4     were in charge of Chile Stadium?

5          And the answer, which is the next designated

6     portion of the deposition is:  The Witness:  From the

7     guard, Lieutenant Barrientos and Lieutenant Rodriguez.

8          I think what was missing there was the question.

9          THE COURT:  All right.  Thank you.

10         (Playing video deposition of

11          Nelso Artemio Barraza Morales.)

12         MR. BECKETT:  Judge, I'm mindful of the time.

13         But that was also an error in the tape,

14     unfortunately.  But I can read the rest, half of the page

15     of the designated deposition sections and we'll be done; or

16     we could do it tomorrow moving.

17         THE COURT:  No, you can go ahead and finish it.

18     If you've got half a page, I think we can manage to hang in

19     there for that.

20         MR. BECKETT:  This is beginning, for the record,

21     in the Barraza deposition, on page 78, line 23.

22         "Question:  At any point during the time you were

23     at Chile Stadium, did you see Rodriguez Fuchloger?

24         "Answer:  Yes.

25         "Question:  Where did you see him in the stadium?

1    "Answer:  I saw him just walking through the guard

2    posts.

3             "Question:  Did you see him at any other time?

4             "Answer:  No.

5             "Question:  Approximately when did you see him?

6             "Answer:  Lieutenant Rodriguez was the person who

7    I saw most at the stadium.

8             "Question:  Okay.  About how many times did you

9    see him at the stadium?

10            "Answer:  On several occasions.

11            "Question:  Did you ever see Rodriguez Fuchloger

12   speaking to Lieutenant Barrientos?

13            "Answer:  Yes.  When we arrived."

14            And I think that is it, Judge.

15            THE COURT:  All right.  Thank you, Mr. Beckett.

16            MR. BECKETT:  Oh, I'm sorry.

17            Yes.  I'm sorry.  I did miss one.  One more

18   question.

19            Did all the soldiers --

20            "Question:  Did all of the soldiers you saw at the

21   stadium wear the orange arm bands?

22            "The Witness:  Yes."

23            THE COURT:  Thank you.

24            All right.  Ladies and gentlemen, I'm going to

25   send you home for the evening with my thanks again for your

1    attention and patience.

2         Let me remind you that it's not the time to begin

3    discussing the case, either amongst yourselves or with

4    anyone else.

5         I'm going to remind you again about avoiding any

6    exposure to the media.  Stay off of the internet and

7    anything that might bring information to you about the

8    case.

9         I hope you have a pleasant evening, a safe drive

10   home.

11        Again, if you'll plan your schedule so you can be

12   back here ready to go at 9:00 in the morning, I would

13   appreciate it.

14        And, Miss Platt, I will check when I get back to

15   chambers to see if I have any other contact with your

16   professor.  But if you're feeling any angst about that,

17   please, let me know and I'll try to reach out to them

18   again.  I don't know what's happened while I've been in

19   here, but I'll check when I get back.

20        JUROR:  Thank you, Your Honor.

21        THE COURT:  You're welcome.

22        Have a good evening.

23        (Jury exited the courtroom at 5:04 p.m.)

24        THE COURT:  Mr. Beckett, you and your team, and

25   Mr. Calderon and his team, should get together and decide

```
 1    how you're going to want to make the record with respect to

 2    these videotape depositions.

 3            I don't know if you want to submit disks of the

 4    actual video or if you want to supply the transcript only.

 5    But the court reporter will need some direction, as will

 6    the courtroom deputy in terms of how to identify the

 7    witness' testimony for the record, and how to make sure the

 8    transcript is accurate and agreed upon for the Court of

 9    Appeals, should it become necessary.

10            So you don't necessarily need to tell me at this

11    moment, but I do need to know at some point.

12            MR. CALDERON:  And, Judge, just real quickly, I'm

13    going over page 82 --

14            THE COURT:  I'm having a hard time hearing you.

15            MR. CALDERON:  I'm sorry, Judge.

16            I was going through the last designation that was

17    read.  And I don't think it was read correctly.  There's

18    probably seven or eight lines, of which I think only

19    four -- like a sentence was extrapolated from that.

20            MR. BECKETT:  That's correct.  I think we're

21    looking at different pages.  So let us confer.  Because the

22    page 82 I had didn't have all of those highlights.  So we

23    can confer on that.

24            THE COURT:  All right.  Mr. Calderon, if there's

25    additional -- if there are additional portions that you
```

```
 1   want to publish, I'll give you an opportunity to do that

 2   first thing in the morning, once you all have had a chance

 3   to talk about what was omitted.

 4           MR. CALDERON:  Thank you, Judge.

 5           THE COURT:  All right.  You're welcome.

 6           Anything else we need to take up before we retire

 7   for the evening?

 8           MR. BECKETT:  No, Judge.

 9           THE COURT:  What's on tap for tomorrow,

10   Mr. Beckett?

11           MR. BECKETT:  Tomorrow we have a live witness,

12   starting with Erica Osorio Araya, and then we go back to

13   some videotape deposition.

14           THE COURT:  Do you think the rest of the day will

15   be videotape?  Video, I should say.

16           MR. BECKETT:  Yeah, I say videotape as well.

17           I think the rest of the day will probably end up

18   being video depositions, yes.

19           THE COURT:  Okay.  All right.  I will see you all

20   then in the morning.

21           I should have told the jury and I forgot.  I have

22   a sentencing in a criminal proceeding, unrelated,

23   obviously, in the morning at 8:30.  It should be relatively

24   straightforward.  I say should be, knock on wood.  And I

25   don't think it would delay our start time.  But if I'm
```

```
 1   running a few minutes behind, that's the reason.

 2          And you all will need to make the front counsel

 3   tables available from 8:30 until I finish that proceeding

 4   at 9:00.  Because the lawyers in that case will need to be

 5   able to come in, and the criminal defendant -- I don't

 6   think he's actually in custody.  Anyway, I'll need the

 7   tables up front.

 8          MR. BECKETT:  Understood, Judge.

 9          THE COURT:  Thank you.

10          All right.  I'll see you in the morning, then, as

11   close to 9:00 as I -- I'll be here.  And you all are

12   obviously welcome to come in.  As soon as I finish my

13   sentencing, then we'll get underway.

14          MR. BECKETT:  Very good.  Thank you.

15          (Proceedings adjourned at 5:07 p.m. until

16           Wednesday, June 15, 2016, at 9:00 a.m.)

17                         * * * * *

18

19                  C E R T I F I C A T E

20

21          I certify that the foregoing is a correct

22   transcript from the record of proceedings in the

23   above-entitled matter.

24

25   s\Amie R. First, RDR, CRR, CRC, CPE
```

1

2                                    **INDEX**

3

4    **PLAINTIFF WITNESSES**

5                                    DIRECT  CROSS  REDIRECT  RECROSS

6    JOAN JARA                               14
     MANUELA BUNSTER           19     51       59
7    MONICA GONZALEZ           61     77       77
     MONICA GONZALEZ           82
8

9    **EXHIBITS**

10                                                     ADMITTED

11   Plaintiff's Exhibit 1                              32

12

13

14

15

16

17

18

19

20

21

22

23

24

25